694 A.2d 295

PATRICE M. GRZANKA, PLAINTIFF–APPELLANT, v. KURT P. PFEIFER, GLADYS M. URENA, CRYSTAL L. HEREDIA, COUNTY OF PASSAIC, DEFENDANTS, AND CITY OF PATERSON, AMERICAN WINKO–MATIC SIGN & SIGNAL, INC., DEFENDANTS–RESPONDENTS.

KURT P. PFEIFER, PLAINTIFF–APPELLANT, v. CRYSTAL L. HEREDIA, GLADYS M. URENA, COUNTY OF PASSAIC, DEFENDANTS, AND CITY OF PATERSON, AMERICAN WINKO–MATIC SIGN & SIGNAL, INC., DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued April 8, 1997—Decided June 3, 1997.

Before Judges DREIER, NEWMAN and VILLANUEVA.

*Barry A. Knopf* argued the cause for appellant Patrice M. Grzanka (*Cohn, Lifland, Pearlman, Herrmann & Knopf,* attorneys; *Diana C. Manning,* on the brief).

*Amy Lynn Fenno* argued the cause for appellant Kurt P. Pfeifer (*Fost, Muscio & Caruso,* attorneys; *Ms. Fenno,* on the brief).

*Gary R. Matano* argued the cause for respondent City of Paterson (*DeYoe, Heissenbuttel & Mattia,* attorneys; *Mr. Matano,* on the brief).

*Sara A. Friedman* argued the cause for respondent American Winko–Matic Sign & Signal, Inc. (*Minichino & Mautone,* attorneys; *James J. Horan,* on the brief).

The opinion of the court was delivered by

DREIER, P.J.A.D.

Plaintiffs, Patrice M. Grzanka and Kurt P. Pfeifer, appeal from summary judgments dismissing their complaints against the City of Paterson and American Winko–Matic Sign & Signal, Inc., the manufacturer of a vandalized and thus nonfunctioning traffic light maintained by the City.

The basic facts in the instant appeal are uncontested. On May 2, 1992, at approximately 7:15 p.m., plaintiff Kurt P. Pfeifer was driving his motorcycle east on Broadway in Paterson. Plaintiff Patrice M. Grzanka was his passenger. At the intersection of Broadway and Straight Street, the motorcycle collided with a car traveling south on Straight Street. The car was owned by defendant Crystal L. Heredia and was driven by defendant Gladys M. Urena. The traffic signal at the intersection of Broadway and

Straight Street was not working at the time of the incident. The City alleges, and all parties apparently agree, that the malfunction was caused because the "door to the meter cabinet had been forced open and all circuit breakers were turned off by vandals." Apparently, the traffic control box was secured by a locked handle as well as a padlock. The City was informed of the malfunction at 8:10 p.m. on May 2, 1992, and repaired the problem by 8:30 p.m. that same evening.

Urena, the driver of the car, set forth her version of the events in an answer to an interrogatory:

[I] was proceeding south on Straight Street approaching the intersection of Broadway. As [I] entered [the] intersection [I] observed a motorcycle approaching on [my] right at an excessive rate of speed; [I] assumed that the other vehicle had a red light as [I] did not observe a red light for [my] vehicle and also assumed that the motorcycle would slow down as [I] had entered the intersection first; when [the] motorcycle did not appear to slow down [I] attempted to brake [my] vehicle and was struck on the passenger side ... by the motorcycle.

Pfeifer also set forth his version of the events in response to an interrogatory:

[I] was travelling at approximately 25 mph and entered the intersection.... When [my] motorcycle was more than 3/4 of the way through the intersection, the motorcycle and the [passengers] were struck by a vehicle operated by the co-defendant, Urena and owned by the co-defendant, Heredia. At the time of the accident, the light controlling traffic at the intersection was inoperable. [I] never saw the other vehicle prior to the accident occurring.

He added in a handwritten statement, "The street light did not catch my attention. I learned that it was not in working condition [only] after the accident." Pfeifer claimed to have no knowledge as to how long the traffic signal had been malfunctioning.

Grzanka submitted an expert report, dated November 28, 1995. The expert reached the following conclusions "with a reasonable degree of scientific certainty:"

1. Winko-Matic should have been aware of the vandalism susceptibility of the traffic control signal device and the potential dangers of not properly making their traffic control signal devices tamper-resistent.

2. The subject traffic control signal device was defective in that it did not contain vandalism deterrent devices.

3. The incident could probably have been avoided by the implementation of simple, inexpensive, and easy-to-install vandalism deterrent safety protection.

## I

Plaintiffs argue that the court should not have granted summary judgment to the City because there were genuine issues of fact still in dispute. *Brill v. Guardian Life Ins. Co.* 142 *N.J.* 520, 540, 666 *A*.2d 146 (1995); *R.* 4:46–5. The judge was to determine whether

> the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.... If there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a "genuine" issue of material fact for purposes of *Rule* 4:46–2.
>
> *Ibid.*

Plaintiffs contend that the City is not immune under the Tort Claims Act, *N.J.S.A.* 59:4–1 to –9,[1] but rather is liable under the municipal property liability section of that Act, *N.J.S.A.* 59:4–2. The City claims it is not liable because it had no notice of the signal's malfunction.

*N.J.S.A.* 59:4–2 provides:

> A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that ...
>
> b.  a public entity had actual or constructive notice of the dangerous condition ... a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
>
> Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.

Here, when looking at the facts in the light most favorable to plaintiffs, as required under *R.* 4:46–2 and *Brill, supra,* at least three of the tests of *N.J.S.A.* 59:4–2 are met.

---

[1] There apparently was no showing that the plans for or design of the cabinet provided for particular locking devices, which therefore would have justified a design immunity claim by the City. *N.J.S.A.* 59:4–6. But, as noted *infra,* this issue was not determined by the motion judge and need not be resolved by us.

First, there was a possible "dangerous condition" at the time of the injuries, namely, the nonfunctioning signal. A "dangerous condition" is "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." *N.J.S.A.* 59:4–1a.

The City, however, argues "that a dangerous condition cannot be determined in connection with this case due to the fact that the parties to this action did not operate their vehicles with due care in a manner which is reasonably foreseeable upon approaching a non-operable traffic signal." The City's logic is that motorists "approaching an inoperable traffic signal do[ ] not have the right to assume that they have the right of way...." To support its claim, the City argues that "neither of the plaintiffs appeared to be aware that there was a traffic light at the intersection in question [and] ... therefore neither of them can claim that they were relying on the placement of a traffic control device at the intersection in question to assure their right of way." *N.J.S.A.* 59:4–4, as interpreted in *Civalier v. Trancucci,* 138 *N.J.* 52, 648 *A.*2d 705 (1994), provides the test for municipal liability for the failure to provide emergency warnings.

This logic is flawed, however, particularly in light of the fact that this is a summary judgment motion, and as such the court must resolve all inferences in plaintiffs' favor. Nothing contained in the statements of either Pfeifer or Urena could be interpreted as absolving the City of liability. Neither party stated directly that they were aware the light was not functioning properly. However, Urena said that she "assumed that the other vehicle had a red light as [I] did not observe a red light for [my] vehicle and also assumed that the motorcycle would slow down as [I] had entered the intersection first...." While this is a statement that firmly establishes her negligence, it does not absolve other parties of their negligence. In a comparative negligence setting, there is a definite possibility that her fault might be exceeded by that of the City and the other driver. Pfeifer wrote in the handwritten

statement, "The street light did not catch my attention. I learned that it was not in working condition [only] after the accident." Thus he too is subject to a comparative fault analysis. Nevertheless, the logical inference from these statements is that the motorists did, in fact, rely on the signal, or more specifically the absence of one, in concluding that each had the right of way. Therefore the broken signal presented a factual issue, namely a possible "dangerous condition."

We reject the analysis of *Lytle v. City of Newark*, 166 *N.J.Super.* 191, 399 *A.2d* 333 (Law Div.1979), where two cars collided in an intersection controlled by traffic lights when the lights were malfunctioning. *Id.* at 192, 399 *A.2d* 333. The City of Newark moved for judgment at the close of plaintiff's case, and thus the court was obliged to give the plaintiff "the benefit of all favorable testimony and all inferences...." *Id.* at 194–95, 399 *A.2d* 333. The court found that, under *N.J.S.A.* 59:4–2, the plaintiff failed to prove it had exercised due care. *Id.* at 195, 399 *A.2d* 333.

[T]he evidence reveals that the traffic signals were not operating at the time of the accident. As such, the intersection was like numerous other unregulated intersections and both [motorists] were required to use due care in negotiating through it.... The fact that the accident happened at all bespeaks of a lack of due care in the use of the intersection by one or both drivers.

[*Ibid*].

The court also found that the "manner in which each party proceeded indicate[d] that the property was not used with due care. As such, a dangerous condition could not have existed." *Ibid.*

▪ Due care, however, is not a prerequisite to recovery by a plaintiff. A lack of due care simply triggers the comparative negligence issue. *N.J.S.A.* 59:9–4. This statute provides, in part:

Contributory negligence shall not bar recovery in an action by any party ... to recover damages to the extent permitted under this act, if such negligence was not greater than the negligence of the party against whom recovery is sought or was not greater than the combined negligence of the persons against whom recovery is sought.

Only if a court could find that no reasonable jury could find that the motorist's fault did not exceed the municipality's and other adverse parties' should summary judgment be granted.

■ There is an anomaly between *N.J.S.A.* 59:4–1a in its definition of "dangerous condition" and *N.J.S.A.* 59:9–4, providing for comparative fault. A "dangerous condition" is one that "creates a substantial risk of injury when such property is used *with due care* . . . ." *N.J.S.A.* 59:4–1a (emphasis added). Yet *N.J.S.A.* 59:9–4 provides that "contributory negligence [*i.e.* a lack of due care] shall not bar recovery" where the plaintiff's negligence was less than the "combined negligence of the person against whom recovery is sought." If, in the simple case, a plaintiff is 10% negligent for not observing a dangerous condition or for reasoning incorrectly that the condition was not potentially harmful, the plaintiff would not have used the property with due care, and the 90% negligent public entity could claim that there was no "dangerous condition." This is not what the statute must mean, if effect is to be given to *N.J.S.A.* 59:9–4. These statutes are explained in Margolis and Novak, *Claims Against Public Entities,* comment on *N.J.S.A.* 59:4–1 (1997) as follows:

Note that it has been held that if persons generally using due care would have been placed at risk by the condition at issue, there is a dangerous condition within the meaning of the Act. If plaintiff was, in fact, negligent in approaching the risk, that negligence is relevant only as a contributory negligence defense available to the entity pursuant to 59:9–4. *Daniel v. State, Dept. of Transp.,* [239 *N.J.Super.* 563, 586–588, 571 *A.*2d 1329 (App.Div.), *certif. denied,* 122 *N.J.* 325, 585 *A.*2d 343 (1990) ]; *Speziale v. Newark Hous. Auth.,* [193 *N.J.Super.* 413], 418–19, 474 *A.*2d 1085 [ (App.Div.1984) ]; *Furey v. County of Ocean,* 273 *N.J.Super.* 300, 311–312, 641 *A.*2d 1091 (App.Div.), *certif. den.,* 138 *N.J.* 272, 649 *A.*2d 1291 (1994).

[*Id.* at 78].

■ Here any person proceeding through the intersection with the traffic light not operating was placed at risk. If either or both drivers proceeded negligently, that negligence was a comparative negligence factor governed by *N.J.S.A.* 59:9–4. Such conduct did not remove the "dangerous condition" status of the signal.

■ The second requirement of *N.J.S.A.* 59:4–2 is also met here. A possible proximate cause of the injuries was certainly the

dangerous condition. Again, *Lytle* provides contrary authority, but we reject it. There the court stated, "It is difficult to see how the absence of a traffic control signal in any way contributed to the accident." *Lytle, supra,* 166 *N.J.Super.* at 195, 399 *A.*2d 333. However, this finding seems odd. "When negligent conduct creates [an unreasonable risk or likelihood of harm or danger to others], setting off foreseeable consequences that lead to plaintiff's injury, the conduct is deemed the [or at least a] proximate cause of the injury." *Kelly v. Gwinnell,* 96 *N.J.* 538, 543, 476 *A.*2d 1219 (1984). "An essential element of proximate cause is foreseeability. When injuries resulting from negligence are not foreseeable, there can be no finding of proximate cause." *Yun v. Ford Motor Co.,* 143 *N.J.* 162, 163, 669 *A.*2d 1378 (1996) (Garibaldi, J. dissenting). Certainly it is foreseeable that an inoperative traffic light at an intersection where the municipality has deemed such a light necessary could materially contribute to an accident. *See, e.g., Civalier v. Trancucci, supra,* 138 *N.J.* 52, 648 *A.*2d 705.

▪ Assuming the City owed a duty to the motorists at least within the liability permitted by *N.J.S.A.* 59:4–4, there was a factual issue whether the City's failure to maintain the light was a proximate cause of the accident. That conduct could reasonably have been found to have led to plaintiffs' accident because, if the light had been operating properly, there probably would have been no accident. Further, contrary to *Lytle,* an accident is certainly a foreseeable result when there are malfunctioning traffic signals, whether, as in *Lytle,* both signals are not functioning, 166 *N.J.Super.* at 192, 399 *A.*2d 333, or in a more serious situation where both are green.

The third requirement of *N.J.S.A.* 59:4–2 is that the broken signal must have "created a reasonably foreseeable risk of the kind of injury which was incurred." This requirement is met because it is foreseeable, as discussed above, that in the event of an inoperative signal, two vehicles may collide.

▪ Finally, however, there is the question whether the City had either "actual or constructive notice of the dangerous condi-

tion ... a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." *N.J.S.A.* 59:4–2b. It is undisputed that there is no proof that the City had actual knowledge of the problem until 8:10 p.m., almost one hour after the accident. There is, however, a dispute concerning constructive notice. To prove constructive notice, plaintiff must establish "that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character." *N.J.S.A.* 59:4–3b.

The City claims it did not have any type of notice of the malfunction before the accident. We were informed at oral argument that the intersection is just one and one-half blocks from the Paterson police station. While we can assume that police cars and other City vehicles would regularly pass through the intersection, we cannot know whether the vandalism that caused the condition of the signal occurred hours, minutes or seconds before the accident.

Plaintiffs, on the other hand, state that more time is needed to complete discovery. Specifically, an eyewitness to the accident, Earl Davis, whose name and address appear in the police report, has yet to be deposed. He is also most probably the witness referred to in Pfeifer's statement that "at the scene ... [a] witness did come forward and advise[ ] the investigating officer that the traffic light was out, that it's been out for a while and he was waiting for something like this to happen." If the witness had been deposed and his testimony was consistent with this representation, then there would be a basis for finding constructive knowledge. If the malfunction was a condition that had been unattended for a significant period, it would obviously be one that the City should have discovered and cured.

However, this argument by plaintiffs requires an examination of the procedural status of this matter. As the City notes, this summary judgment hearing was held on the eve of trial. The City asserts that because of this, and the particular history of this case,

"it is not appropriate for [plaintiffs] to argue that additional discovery may reveal material issues of material fact."

Under the rules, discovery is limited to 150 days, measured from "the date of service of the original complaint." *R.* 4:24-1. This time limit is meant to be firm unless good cause is shown on motion and notice and an order is entered. *R.* 4:24-1. There is no question, however, that this time limit is regularly relaxed, especially where the discovery relates to a witness who is necessary to plaintiff's cause of action. Here, however, the complaint naming the City as a defendant was filed on January 6, 1993, and on July 14, 1994, over eighteen months later, the City first moved for summary judgment. That motion was denied on August 22, 1994, to allow further discovery. The City then moved for summary judgment a second time on September 5, 1995, having given plaintiff an additional fourteen months. That motion was denied on October 13, 1995, again to allow discovery to continue. Thereafter plaintiffs never filed a motion to compel discovery until they received the City's third motion for summary judgment, returnable January 19, 1996, after the initial trial date of December 11, 1995. It was not until March 8, 1996, after the adjourned trial date of March 4, 1996, when oral argument was heard, that summary judgment was finally granted. This was after the third motion again revealed plaintiffs' attorney's failure to complete discovery, even of the one witness who might show notice to the City. After thirty-eight months, it certainly appears that plaintiffs have had sufficient time to come forward with some evidence to demonstrate that the City had constructive knowledge of the malfunctioning signal. As late as at oral argument of this appeal, all that plaintiff could state is that the telephone directory apparently still lists the potential witness at the same address. According to one plaintiff's counsel, the first time there was an attempt to locate this witness was the day before the oral argument of this appeal, almost five years after the accident.

At some point the passage of time so prejudices a party that the discovery must end. Even if the named witness was now to be

contacted and did remember the event, the City would be foreclosed from refuting the testimony with other witnesses from the neighborhood. A recollection now, almost five years after the fact, of the period of time a traffic light was inoperative would be viewed with great suspicion. Even if the original witness could say that his report at the time was accurate, it would be of little use when viewed against the unfairness to the City.

On the basis of *N.J.S.A.* 59:4–2, we are constrained to affirm the summary judgment in favor of the City. We therefore need not reach the issue whether the interrogatory answers of the drivers satisfy the reliance required by *Civalier, supra,* 138 *N.J.* 52, 648 *A.2d* 705, interpreting *N.J.S.A.* 59:4–4. In *Civalier,* the Court stated that *N.J.S.A.* 59:4–4 only applies after the requirements of *N.J.S.A.* 59:4–2 have been satisfied. 138 *N.J.* at 69, 648 *A.2d* 705.

## *II*

Plaintiffs next argue that the judge should not have granted summary judgment in favor of Winko–Matic, the manufacturer of the signal device. Plaintiffs claim that Winko–Matic is not immune from liability under *N.J.S.A.* 59:4–6, the design immunity section. Winko–Matic acknowledges that the trial judge did not resolve the issue, and we also find it unnecessary to exercise our original jurisdiction under *R.* 2:10–5 to determine it because plaintiff failed to present a prima facie showing of a defective product.

Plaintiff Grzanka next argues that Winko–Matic is strictly liable because it manufactured "and distributed a traffic control device which did not adequately protect against vandalism." Plaintiff thus appears to suggest that Winko–Matic is liable because of either a manufacturing defect or a design defect.

Under the New Jersey Products Liability Act, a product which has caused harm has a manufacturing defect if it "deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae." *N.J.S.A.*

2A:58C–2a. There was no claim or proof that the traffic control signal cabinet deviated from its manufacturer's design specifications.

However, it is possible that Winko–Matic is liable for a design defect if vandalism was reasonably foreseeable and the protective devices installed were unreasonable when the signal itself was installed in 1984. The judge considered this possibility during oral argument. With regard to Winko–Matic's potential liability, he stated:

I was concerned also at the [first argument] whether Winko–Matic had any independent negligence, because absent independent negligence . . . Winko–Matic might . . . be let out on Summary Judgment.

. . . .

. . . [T]he reason [for granting the motion] is absent any independent negligence, I don't think . . . a . . . Winko–Matic type entity would have a responsibility unless it were in an area of a product liability situation.

Here, this was installed back in I believe it's 1984. . . . This happened years later. We cannot just cite these general propositions and nuances or niceties for— as general propositions if they don't fit the facts at hand.

. . . .

. . . I don't know that Winko–Matic is supposed to foresee vandalism in this kind of situation which gives rise to an automobile accident. . . .

■■■ The judge's conclusions were correct, even though he used negligence terminology. In *Tirrell v. Navistar International, Inc.*, 248 *N.J.Super.* 390, 398, 591 *A.*2d 643, *certif. denied,* 126 *N.J.* 390, 599 *A.*2d 166 (1991), a design defect case, we explained that the Product Liability Act "no longer recognizes negligence . . . as a viable separate claim for 'harm' or breach of warranty (with the exception of an express warranty) caused by a defective product." In other words, "common-law actions for negligence or breach of warranties (except express warranties) are subsumed within the . . . statutory cause of action. . . ." *Ibid. See N.J.S.A.* 2A:58C–1b(3). Thus, here there could be no separate cause of action against Winko–Matic grounded in negligence.

■■■ "A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm

was not reasonably fit, suitable or safe for its intended purpose...." *N.J.S.A.* 2A:58C–2. An "intended" purpose also includes a reasonably foreseeable use. *Suter v. San Angelo Foundry & Machine Co.*, 81 *N.J.* 150, 169, 406 *A.*2d 140 (1979).[2] Plaintiff Grzanka urges that the break-in and deactivation of the traffic light was a reasonably foreseeable use (or even misuse) of the product and that defendant's design to protect against such tampering was unreasonable. However:

> The decision whether a product is defective because it is "not reasonably fit, suitable and safe" for its intended purposes reflects a policy judgment under a risk-utility analysis. That analysis seeks to determine whether a particular product created a risk of harm that outweighs its usefulness. Risk-utility analysis is especially appropriate when a product may function satisfactorily under one set of circumstances and yet, because of a possible design defect, present an unreasonable risk of injury to the user in other situations.
>
> Under a risk-utility analysis, a defendant may still be liable when a plaintiff misused the product, if the misuse was objectively foreseeable.... Hence, the plaintiff in a design-defect products-liability suit may succeed even if the product was misused, as long as the misuse or alteration was objectively foreseeable.
>
> The absence of misuse is part of the plaintiff's case. Misuse is not an affirmative defense. Thus, the plaintiff has the burden of showing that there was no misuse or that the misuse was objectively foreseeable.
>
> [*Jurado v. Western Gear Works*, 131 *N.J.* 375, 385–386, 619 *A.*2d 1312 (1993) (citations omitted).]

While the tampering and vandalizing of the control box was not strictly a "misuse" by the owner or user of the product, we see a similar duty to protect against a foreseeable tampering.

Here, plaintiffs sought to prove that the traffic signal was "not reasonably fit, suitable or safe for its intended [or reasonably foreseeable] purpose" through the use of the report of an expert witness. Thus the report was crucial to determining whether the

---

[2] It was clearly the intent of the Legislature to include such reasonably foreseeable uses. A Senate Judiciary Committee Statement was filed with the Product Liability Act, and the Act, in *N.J.S.A.* 2A:58C–1a, states that such a statement should be "consulted in the interpretation and construction of" the Act. The Statement notes that the elements of the causes of action as stated in Section 2 were not meant to change the law, and were "to be determined according to the existing common law of the State." The language of *Suter* therefore was not to be diluted by the shorthand reference in Section 2.

design of the signal control box, with a locked case and a padlock, was indeed defective. But, as is discussed *infra* at Point III, that opinion was an inadmissible net opinion. Therefore, plaintiffs failed to make the necessary threshold showing of a defective design. The design defect claim necessarily fails, and this court must affirm.

The claimed defect is that Winko–Matic manufactured "and distributed a traffic control device which did not adequately protect against vandalism." The critical question, assuming the product was defective, is whether at the time of the traffic signal's installation in 1984, Winko–Matic should have foreseen and more adequately protected against the type of vandalism that gave rise to this dispute. If such tampering was reasonably foreseeable at that time, then the defect did exist when the traffic signal left Winko–Matic's "hands." However, it was plaintiffs' burden to prove the foreseeability, and again, the only proof offered was the expert's report properly excluded by the motion judge. Plaintiffs did come forward with an allegedly reasonable alternative design to protect against the tampering and vandalism in this case, adopting the deadbolt design later used by the City. *Cf. Smith v. Keller Ladder Co.*, 275 *N.J.Super.* 280, 283–84, 645 *A.2d* 1269 (App.Div.1994); *Restatement (Third) of Torts: Product Liability* § 2(b) (Proposed Final Draft, April 1, 1997, approved by the American Law Institute May 20, 1997). Yet there is a second aspect to the "reasonable alternative design" test. Without proof of a reasonably foreseeable risk, so that "the omission of the alternative design renders the product not reasonably safe," plaintiffs' alternative design fails to meet the full test of *Restatement* § 2(b). *See Design Defects Under the Proposed Section 2(b) of the Restatement (Third) of Torts: Products Liability—A Judge's View*, 20 *U. Mich. J.L. Reform* 221, 233–34 (1997).

### III

Plaintiffs' final claim of error is that the report of their expert, Dr. J. Stephen Duerr, Ph.D., P.E., CPC, should not have been

ruled an impermissible net opinion. The judge's reasoning in this area is somewhat confusing. He stated that he ordered the second argument because he "thought the only issue was as to the expert's opinion which had nothing to do really with the ... broken red light type situation, but more to do with this foreseeability as to crime rate." The judge heard a lengthy argument whether Duerr gave merely a net opinion. However, before rendering his decision, he stated, "I'm not going to rule on it on [the basis of] a net opinion. So, you can save your breath there." He then said he would grant the motion if he found no negligence on Winko–Matic's part. Apparently, however, the motion judge found the expert's report to state merely a "net opinion." If we are incorrect, then we exercise our original jurisdiction under *R.* 2:10–5 and make such a ruling ourselves.

Under *N.J.R.E.* 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Furthermore, under *N.J.R.E.* 703, "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing."

The net opinion rule is a prohibition against speculative testimony. *Vuocolo v. Diamond Shamrock Chem. Co.*, 240 *N.J.Super.* 289, 300, 573 *A.*2d 196 (App.Div.), *certif. denied*, 122 *N.J.* 333, 585 *A.*2d 349 (1990). "Under this doctrine, expert testimony is excluded if it is based merely on unfounded speculation and unquantified possibilities." *Ibid.* Therefore, "[t]he 'net opinion' rule appears to be a mere restatement of the established rule that an expert's bare conclusions, unsupported by factual evidence, [are] inadmissible. It frequently focuses ... on the failure of the expert to explain a causal connection between the act or incident complained of and the injury or damage allegedly resulting therefrom." *Buckelew v. Grossbard*, 87 *N.J.* 512, 524,

435 A.2d 1150 (1981). The cases addressing this issue in New Jersey are legion. *See e.g., Nguyen v. Tama,* 298 *N.J.Super.* 41, 688 A.2d 1103 (App.Div.1997).

Here, however, the record demonstrates that plaintiffs' expert's report was based on supposition, non-sequiturs and unsubstantiated conclusions, and thus clearly constituted a net opinion. In forming his opinion, the expert relied on the following: (1) the traffic signal as currently in use; (2) the police report from the incident; (3) the pleadings and related exhibits; (4) "Municipal Profile Data" for 1991 and 1993, *Crime in New Jersey;* and (5) "Municipal Offense Data, 1975," *Crime in New Jersey.* He also observed the present state of the area around the device. He stated:

> There can be no question that the intersection location is prone to acts of vandalism based on observations of the area, the damaged and "Rube Goldberg" protected traffic control signal device, and the nearby public telephones. Some street lighting is present but shadows would hide activity especially between the traffic control signal device and the fence and on Straight Street away from Broadway.

Earlier in the report he described the protection device:

> [T]here is an installed bolt/washer which apparently is part of an attempt to make the traffic control signal device more resistant to vandals. Information provided indicates that the bolt/washer was installed by the City of Paterson after the incident, modifying the traffic control signal device as manufactured and provided by Winko–Matic in an attempt to make it more resistant to vandalism and damage that could adversely impact the operation of the traffic lights. The ... protection devised by the City of Paterson was not provided by ... Winko–Matic.

The expert also determined that "published Municipal Offense Data for 1975 and Municipal Profile Data for 1991 and 1993 show that statistics on crime in this specific Urban Center area (Paterson) are quite high in terms of nonviolent (and violent) crime as compared to other urban and suburban areas in the county and the state." [3] Furthermore, he felt that "Winko–Matic had the

---

[3] The expert equated the high incidence of non-violent crime with vandalism. He obviously assumed that vandalism constituted a large percentage of reported nonviolent crime. He stated, "[W]ith non-violent crime in Paterson so high, and the observations in the area of vandalism, it's clear that vandalism is high in Paterson." He apparently disregarded thefts, burglaries, all drug crimes, prosti-

responsibility to prevent and deter the vandalism and its conse-
quences. Winko–Matic failed to take that responsibility by only
providing the key lock and by not providing the necessary addi-
tional security measures ... to make the control panel resistant to
the dangers of the area vandalism." The expert then reached his
three conclusions, quoted earlier, "with a reasonable degree of
scientific certainty."

However, the expert conceded in his deposition that he did not
know of any specifications that may have been required by a
governmental entity for "locking devices on the traffic control
box." In addition, in his research the expert found no statistics
regarding vandalization of other traffic control signal boxes, nor
did he independently research the issue of vandalism of traffic
control boxes in either the City or the County. Consequently, he
was unable to identify the number of traffic control boxes that
were vandalized in Paterson or elsewhere in 1992, in 1984 when
the controls were installed, or in any other time period.

Significantly, plaintiffs' expert also failed to consult with any
other experts or refer to commercial literature prior to his prepa-
ration of the report. Moreover, he failed to research any OSHA,
ANSI or other standards, treatises, designs of similar traffic
control boxes by other manufacturers, or the type of security, if
any, provided to secure traffic control boxes in other cities.

In conclusion, plaintiffs' expert stated in his deposition that the
sole basis for his conclusion that the area was prone to vandalism
was his personal observations of current conditions. Specifically,
he saw that many years after the cabinet was installed, the public
telephone required protection (explained at oral argument as the

---

tution, and a host of other non-violent offenses which are rampant in urban
centers. Vandalism (criminal mischief, or the like) often constitutes disorderly
conduct that does not even rise to criminal status in New Jersey. *See N.J.S.A.*
2C:17–3. However, the removal of a traffic signal may be a third-degree crime.
*N.J.S.A.* 2C:17–3b(1). Damaging traffic signals is also a motor vehicle offense.
*N.J.S.A.* 39:4–183.5. An expert's conclusions, of course, can be no better than
their foundation.

coin box being reinforced), the light over the phone had been damaged, there was graffiti in the area, and this traffic control signal cabinet was damaged and had graffiti on it as well. However, he had no specific information as to any acts of vandalism to the traffic control cabinet in question at any time either before or after the incident. It also appears that he had no specific information that the current conditions at all equated with those in 1984, when the control cabinet was installed, or at any earlier date when it was designed.

It is evident that the expert's report was based "merely on unfounded speculation and unquantified possibilities." *Vuocolo, supra,* 240 *N.J.Super.* at 300, 573 *A.*2d 196. His deposition demonstrated that his report was unsupported by any relevant factual evidence. We therefore conclude it is a net opinion and thus inadmissible.

Affirmed.