As modified, we affirm on the appeal and the cross-appeal.

815 A.2d 502

LONNIE I. CLARKE, SR., PLAINTIFF/APPELLANT, v. TOWNSHIP OF MOUNT LAUREL, OFFICER TIMOTHY CONNORS, OFFICER ARTHUR DORST, OFFICER MICHAEL STONE, OFFICER FRANK KANICKI, MOUNT LAUREL TOWNSHIP CHIEF OF POLICE DAVID HAAS, DEFENDANTS/RESPONDENTS.

LONNIE I. CLARKE, III & MARY JANE CLARKE, PLAINTIFFS/APPELLANTS, v. TOWNSHIP OF MOUNT LAUREL, OFFICER TIMOTHY CONNORS, OFFICER ARTHUR DORST, OFFICER MICHAEL STONE, OFFICER FRANK KANICKI, MOUNT LAUREL TOWNSHIP CHIEF OF POLICE DAVID HAAS, DEFENDANTS/RESPONDENTS.

LONNIE I. CLARKE, III, ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF LONNIE CLARKE, IV, PLAINTIFF/APPELLANT, v. TOWNSHIP OF MOUNT LAUREL, OFFICER TIMOTHY CONNORS, OFFICER ARTHUR DORST, OFFICER MICHAEL STONE, OFFICER FRANK KANICKI, MOUNT LAUREL TOWNSHIP CHIEF OF POLICE DAVID HAAS, DEFENDANTS/RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted November 6, 2002—Decided February 7, 2003.

Before Judges PRESSLER, WALLACE, JR. and CIANCIA.

*Gary D. Ginsberg,* attorney for appellants (*Adam M. Raditz,* on the brief).

*Frank N. Yurasko,* attorney for respondents.

The opinion of the court was delivered by

WALLACE, JR., J.A.D.

Decedent was fatally shot by the police after he brandished a weapon inside his parents' home. Plaintiffs filed these wrongful death actions against individual police officers and the Township of Mount Laurel. The separate complaints were consolidated pursu-

ant to an order dated April 19, 1999. Defendants sought summary judgment, relying on good faith immunity in the enforcement of any law under *N.J.S.A.* 59:3–3. The Law Division judge agreed and dismissed plaintiffs' complaint. On appeal, plaintiffs contend it was error to dismiss their complaint because they established a *prima facie* case of willful misconduct which the jury should decide. We agree that a question of fact for the jury exists and reverse.

The record on the motion for summary judgment established the following facts. On the night of December 11, 1996, police officers Timothy Connors, Arthur Dorst, and Michael Stone responded to a domestic violence complaint between decedent Lonnie Clarke, IV, and his parents, plaintiffs Lonnie Clarke, III, and Mary Jane Clarke. Lonnie wanted to leave the house and drive the car, but his parents objected because they believed he was intoxicated. Officer Dorst was aware that Lonnie had a prior psychological history. After speaking with the parents, at least one of the officers went to Lonnie's downstairs bedroom and spoke to him. Lonnie said he just wanted to be left alone. The officers returned to speak with the parents who informed them that Lonnie had previously stolen their vehicle and credit cards.

After investigating the call, the police officers left the house. While outside the house, the police heard a gun shot. Officer Stone, the senior officer at the scene, requested help. The police noticed Lonnie began to break through the screen of the ground-level bedroom window with the butt of a rifle. Officer Stone re-entered the house and removed the parents.

Officer Dorst attempted to speak with Lonnie. Lonnie yelled that someone was going to die tonight, and he was going to kill some cops. Lonnie then retreated back into the bedroom. The police called the tactical team.

Officer Connors spoke to the parents who by this time were located at a neighbor's house. He was informed that the only way into the house was the front doorway. Officer Connors then entered the house, positioned himself at the top of the stairway

inside the front door, and turned off the lights. His intention was to contain Lonnie in the downstairs portion of the home and prevent access to the second floor. At some point, Lonnie left his bedroom and approached the stairs with his rifle pointed at Officer Connors. Officer Connors fired his weapon at Lonnie, who retreated to his bedroom.

Officer Frank Kanicki, who had responded to the earlier call for help, also entered the home. He positioned himself on the opposite side of the staircase from Officer Connors.

Meanwhile, Lonnie was talking to Officer Dorst at the front window and requested an open telephone line. Lonnie continued to threaten the police. Lonnie yelled that he had forty-eight bullets and he was going to get the police. Officer Connors saw Lonnie leave his bedroom and open the bolt on his rifle as if to reload the weapon. Officers Connors and Kanicki instructed Lonnie to drop the gun and stay where he was. Lonnie refused and started walking up the stairs with his rifle pointed towards Officer Kanicki. Officer Connors then fired his weapon several times, killing Lonnie. The SWAT/tactical force team, which had been called, arrived sometime after the incident.

At his deposition, Officer Connors stated he was aware of the Mt. Laurel Police Department procedures in effect in December 1996 addressing proper course of action when faced with hostage, barricade, or sniper situations. He said the procedure was essentially that which was later codified in General Order 99–1 (GO 99–1). Phase I of the GO 99–1 pertains to actions taken by the police upon arrival at the scene and provides that the first officer who arrives shall: (1) assume command until the arrival of a senior officer; (2) contain the suspect; (3) establish a perimeter; (4) reinforce the perimeter containment area with officers from adjacent jurisdictions when needed; (5) avoid confrontation when possible in favor of controlling and containing the situation until the arrival of trained Tactical and/or Critical Incident Negotiation Personnel; (6) when confronted by hostage/barricaded subjects, shall not initiate tactical actions other than those necessary to

protect the lives and safety of themselves or others consistent with the New Jersey Code of Criminal Justice, *N.J.S.A.* 2C:3–1 to 2C:3–10, the Attorney General Guidelines concerning the use of force, and the Mt. Laurel Police Department's use of force policy as identified in GO 98–2; and (7) evacuate the affected area, if possible. Phases II and III of GO 99–1 pertain to the actions by the officer in charge of the tactical team.

Officer Connors stated that the same basic information contained in GO 99–1 existed in prior orders and that he was trained to avoid confrontation. Furthermore, he received in-service training three to four times a year concerning how to deal with barricaded subjects and snipers. He acknowledged that one month prior to the shooting incident, he had received training on the use of different levels of force, including when to use such force with barricaded subjects. Officer Connors maintained that police procedure in December of 1996 required of the first officer to arrive in a sniper or barricaded subject situation: to assume command until a senior officer or supervisor arrived; to establish a perimeter, meaning to set officers up in locations to allow a suspect certain movement but containment at the same time; and to reinforce the perimeter containment areas with officers from adjacent jurisdictions. Although he could not recall reading a procedure that required officers to avoid confrontation until the arrival of trained tactical and/or critical incident negotiation personnel, he stated that officers were trained to avoid confrontation and were aware of such procedures.

Additionally, Officer Connors acknowledged that he received training prior to 1996, in accordance with the New Jersey Code of Criminal Justice, that basically states that officers confronted by hostage or barricaded subject incidents shall not initiate tactical actions other than those necessary to protect the lives and safety of themselves or others.

The commander of the SWAT/tactical force team on that date, Lieutenant Michael Dugan, was also deposed. He recalled the December 11, 1996, incident and that he was called to the scene

sometime after midnight. He agreed that the substance of GO 99-1 was in effect at that time. He had previously been involved in about ten barricaded person situations, but none of those situations involved shooting or the establishing of a perimeter inside the building. Lieutenant Dugan could not recall ever entering inside a private house and taking up a perimeter inside the house to prevent a suspect from gaining access to a second or higher floor. He explained that the establishment of a perimeter required the containment of a suspect "within a room or within a building, or from the outside, whatever is tactically feasible with regard to the officers' and civilian safety". He stated that, when possible, the police officers should avoid confrontation and wait for the trained tactical officers to arrive.

Plaintiffs obtained the services of Reginald Mallard to render an expert report concerning the conduct of defendants on the night of the incident. At the time of his report in April 2001, Mallard was a Training Officer for the Connecticut Police Academy. In his report, Mallard criticized Officer Connors for entering the premises to establish a perimeter inside the house, and he opined that Officer Connors' conduct contradicted SWAT fire discipline and personal threat management.

Defendants' initial motion for summary judgment was denied. Defendants then filed a second motion for summary judgment. After considering the evidence and the arguments of counsel, the motion judge granted defendants' motion and dismissed plaintiffs' complaint. The judge found insufficient evidence to raise a genuine issue of material fact to prevent a determination that the police officers acted in good faith in responding to the situation. The judge concluded that the police officers were immune from liability under the good faith immunity of *N.J.S.A.* 59:3-3. This appeal followed.

Plaintiffs contend they presented sufficient evidence of willful misconduct by Officer Connors that created material disputed issues of fact which must be resolved by a jury.

Initially, we note that summary judgment is appropriate where "there is no genuine issue as to any material fact challenged and ... the moving party is entitled to a judgment or order as a matter of law." *R.* 4:46–2(c). A fact issue is genuine if "the evidence submitted by the parties on the motion, together with all legitimate references therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." *R.* 4:46–2(c). *Brill v. Guardian Life Ins. Co.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). Thus, we must view the evidence in the light most favorable to plaintiffs, the non-moving parties.

The Tort Claims Act (Act), *N.J.S.A.* 59:1–1 to 12–3, establishes a presumption that a "public entity"—such as the Township of Mt. Laurel—is immune from liability for an injury caused by it or an employee unless made liable by some express provision of the Act. *N.J.S.A.* 59:2–1(a); *Manna v. State,* 129 *N.J.* 341, 346–47, 609 *A.*2d 757 (1992). The liability provisions of the Act are subordinate to the immunity provisions, requiring the court to analyze the immunity issue first. *See Malloy v. State,* 76 *N.J.* 515, 519–21, 388 *A.*2d 622 (1978). Thus, "the approach of the Act is to broadly limit public entity liability." Harry A. Margolis and Robert Novack, *Claims Against Public Entities,* comment to *N.J.S.A.* 59:1–2; *see also Alston v. City of Camden,* 168 *N.J.* 170, 176, 773 *A.*2d 693 (2001).

Pursuant to *N.J.S.A.* 59:3–3, "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law." However, *N.J.S.A.* 59:3–14, the public employee immunity exception, limits the good faith provision and provides, "[n]othing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted ... willful misconduct." *N.J.S.A.* 59:3–14(a). In *Tice v. Cramer,* 133 *N.J.* 347, 627 *A.*2d 1090 (1993), a case implicating the immunity of police officers in the context of a motor vehicle chase under *N.J.S.A.* 59:5–2(b)(2), our Supreme Court held the statute "confers absolute immunity, except where the police officer engages in willful misconduct." *Id.* at 356, 627 *A.*2d 1090.

■ Although *Tice* involved a vehicle chase, recently the Court held that immunity also applied to the negligent discharge of an officer's gun during a foot pursuit of a suspect. *Alston, supra,* 168 *N.J.* at 183, 773 *A.*2d 693. The Court explained in *Alston* that the:

> [G]ood faith immunity under section 3-3 has two alternate components. [citations omitted]. A public employee either must demonstrate 'objective reasonableness' or that he behaved with 'subjective good faith'. [citations omitted]. A public employee need prove only one component. Immunity attaches if the employee can show either objective or subjective good faith. We note that both forms of good faith overlap as a matter of fact and law.
>
> [*Id.* at 186, 773 *A.*2d 693].

The Court, however, also recognized that if the injury during the pursuit was the result of willful misconduct, immunity would not apply. *Id.* at 183–84, 773 *A.*2d 693. Consequently, defendants have an absolute immunity under *N.J.S.A.* 59:5–2b and 59:3–3 unless there is evidence of willful misconduct on the part of a public employee.

Willful misconduct is not defined in the Act. In *Fielder v. Stonack,* 141 *N.J.* 101, 661 *A.*2d 231 (1995), the Court noted that "willful misconduct is not immutably defined but takes its meaning from the context and purpose of its use." *Id.* at 124, 661 *A.*2d 231. Additionally, the Court explained that "[p]rior decisions have suggested that willful misconduct is the equivalent of reckless disregard for safety," and is "more than an absence of 'good faith.' " *Ibid.*

The Court expanded on the meaning of willful misconduct in *Alston.* In that case, a police officer was pursuing a drug suspect on foot when his firearm discharged and injured an innocent bystander. The officer explained that earlier in the day he had drawn his gun, removed the safety, and inadvertently left the safety off. As he was chasing the suspect, his gun slipped out of his holster, fell to the ground, and discharged, injuring a bystander. *Alston, supra,* 168 *N.J.* at 174, 773 *A.*2d 693. Plaintiff filed a negligence action against the City of Camden, the police department, and the police officers. A jury trial was held. The trial court instructed the jury that defendants were entitled to pursuit immunity under *N.J.S.A.* 59:5–2b(2) unless the jury determined

that the police officer's conduct rose to the level of willful misconduct. *Id.* at 175, 773 *A.*2d 693. The trial court instructed the jury that "a violation of standing orders constitutes willful misconduct if defendant intentionally disobeys a specific standing-order which he or she is aware." *Id.* at 183, 773 *A.*2d 693. Furthermore, the trial court told the jury that "[w]illful misconduct is between simple negligence and the intentional infliction of harm. Conduct can be considered willful if it's done with the knowledge that injury is likely or probably will result in injury." *Id.* at 184, 773 *A.*2d 693. Later, in response to a question from the jury to clarify the difference between negligence and gross negligence and how that difference affects the issue of willful misconduct, the trial court instructed that willfulness requires "a positive element of conscious wrongdoing" or the "commission of a forbidden act with actual knowledge that the act is forbidden." *Ibid.* The Supreme Court approved the trial court's instructions and held that "willful misconduct requires 'much more' than mere negligence" and falls "somewhere on the continuum between simple negligence and the intentional infliction of harm." *Id.* at 185, 773 *A.*2d 693.

■ With this background, it is evident that an order substantially similar to GO 99–1 was in effect in December 1996. Officer Connors testified that the same basic factors included in GO 99–1 were also contained in the order effective at the time of the incident. Additionally, the police officers received in-service training within the police department regarding how to deal with barricaded subjects and snipers approximately three to four times a year. Although Officer Connors did not recall that portion of GO 99–1 that required the police at the scene to contain the situation until the arrival of trained tactical and/or critical incident negotiation personnel, he acknowledged that he received training prior to 1996 in accordance with the Code of Criminal Justice which requires that officers confronted by hostage or barricaded subject incidents shall not initiate tactical actions other than those necessary to protect the lives and safety of themselves or others. Furthermore, Officer Connors was aware that police officers were trained to avoid confrontation from the academy-level education,

and he was aware of the procedures that required officers to avoid confrontation until the arrival of trained tactical and/or critical incident negotiation personnel.

Thus, there was evidence that a standing order existed to establish a perimeter, to contain the situation, and to avoid confrontation. Here, Officer Connors was aware that the tactical team had been called and was on the way to the scene. Despite this knowledge, Officer Connors elected to establish a perimeter inside the house, with the likelihood of confrontation, rather than avoid it by establishing the perimeter outside the house. It was disputed whether the perimeter in the standing order should be established within or outside of the house, thus presenting a genuine issue of material fact challenged by plaintiffs. It is a jury question whether Officer Connors willfully violated a known standing order and then engaged in conduct he knew was not appropriate. *See Alston, supra,* 168 *N.J.* at 183, 773 *A.*2d 693. Consequently, it was error to grant summary judgment in favor of defendants.

We reverse and remand.