**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0522-23

MARCELLA SCHEMBARI,

    Plaintiff-Appellant,

v.

ST. MICHAEL'S THE ARCHANGEL
ROMAN CATHOLIC CHURCH, THE
DIOCESE OF PATERSON, CTS
GROUP, REBECCA RUIZ-ULLOA,
and WILLIAM SLACK,

    Defendants-Respondents,

and

EASTERN CONTRACTORS, INC.,
FRANK KALETA, and ANDREW
VINCENT CO., a/k/a ANDREW
VINCENT A CONTRACTOR,
ANDREW VINCENT CO., a/k/a
ANDREW VINCENT A CONTRACTOR,

    Defendants.

_____

Submitted November 13, 2024 – Decided February 21, 2025

Before Judges Sumners and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-0415-20.

Hegge & Confusione, LLC, and Abrahamsen Grant, LLC, attorneys for appellant (Michael Confusione and Richard J. Abrahamsen, on the briefs).

Carey & Grossi, attorneys for respondents St. Michael's the Archangel Roman Catholic Church, The Diocese of Paterson, and Rebecca Ruiz-Ulloa (John J. Grossi, III, on the brief).

Hoagland, Longo, Moran, Dunst & Doukas, LLP, attorneys for respondents CTS Group and Williams Slack (Frank J. Kontely, III, of counsel and on the brief; Ariel Berkowitz, on the brief).

PER CURIAM

Marcella Schembari walked up the steps of the main entrance to enter St. Michael's, the Archangel Roman Catholic Church, in Paterson. As she was entering, someone exited the front door, which opened outward and hit Schembari, knocking her down the steps. Alleging claims of simple negligence, gross negligent, wanton or willful conduct, and professional negligence, Schembari sued St. Michael's, the Diocese of Paterson, Rebecca Ruiz-Ulloa,[1]

---

[1] Ruiz-Ulloa passed away during the trial court litigation. The record does not indicate whether Schembari amended her complaint to name Ruiz-Ulloa's estate as a defendant.

the Diocese's full-time architect, CTS Group Architecture Planning, PA, improperly pled as CTS Group, William Slack, Eastern Contractors Inc., Frank Kaleta, and Andrew Vincent Co.[2]  Schembari appeals the motion judge's orders barring her liability expert report as net opinion and granting summary judgment dismissal of her amended complaint.  We affirm.

I

The pertinent facts are undisputed.  St. Michael's was built in 1836 and designated an historic landmark in 1978.  Schembari worshiped at the church for over twenty years.  On a Sunday morning in February 2018, Schembari walked up the seven front steps of the church's main entrance onto its sixteen-inch front landing.  When the doors are closed, as they were when Schembari was about to enter, a person exiting the church cannot see someone standing on the landing.  Before Schembari could open the door, which opens outwards toward the landing, someone exiting the church opened one of the doors, striking Schembari.  She fell backwards down the front steps, sustaining permanent injuries.

---

[2]  Claims against Eastern Contractors, Kaleta, and Andrew Vincent were dismissed by the trial court for lack of prosecution.  Schembari later voluntarily dismissed them in a stipulation of dismissal after filing this appeal.

A-0522-23

During the discovery following Schembari's lawsuit, she retained Kevin Aslanian, AIA, a New Jersey licensed architect, as her liability expert. Aslanian opined St. Michael's and the Diocese (the church defendants) had a "duty to keep the [church] free of dangerous, hazardous, and unreasonably unsafe conditions," while CTS and Slack (collectively CTS), and Ruiz-Ulloa, had a duty "to point out the hazards in their inspections and building assessments" to St. Michael's and the Diocese. He asserted the church defendants and the Diocese breached their duty by failing to properly "[c]onstruct[]" and "maintain[]" the church's front doors and landing, which caused Schembari to fall and suffer injuries. He asserted CTS and Ruiz-Ulloa "should have advised" the church defendants "of the danger and hazard of the front entrance" and addressed them while the church was closed as part of a 2010-2014 "Historic Exterior Façade, Roof, and Tower Repair" restoration project, which "replace[d] existing cast stone features," repaired damage from water penetration, rebuilt the church's façade, and prevented bricks from falling onto the street. Aslanian also stressed that Ruiz-Ulloa, in her capacity as the Diocese's architect, had the responsibility to ensure the church defendants complied with state and municipal safety requirements.

4

Aslanian's report referenced the International Building Code, New Jersey Edition, 2018, 1011.1 to 1014, a model code adopted by reference as part of the New Jersey Uniform Construction Code, N.J.A.C. 5:23-3.14(a)(1) (collectively code) and the Americans with Disabilities Act (ADA) 2010 standards, which he asserted were violated and the violations were "the direct cause of . . . Schembari's accident." The expert's report included provisions of the code and ADA that seemingly are not relevant to Schembari's accident (e.g., ramps, handrails, revolving doors, and headroom). Nonetheless, it did include provisions pertaining to a building's entrance door, stairs, and landing, which are relevant to her accident.

Slack, a New Jersey licensed architect and CTS partner, supervised the project. He acknowledged in his deposition that the church's front entrance did not meet current safety codes. However, he said "there was no requirement to upgrade the entrances or egress to current code," and his firm's restoration scope of work did not include bringing the church "up to current code." He further testified CTS did not examine the front entrance because it was "not in a deteriorated or damaged or hazardous condition." He claimed the only safety concerns he discussed with Ruiz-Ulloa related to erecting scaffolding over the

sidewalk during the restoration work to prevent loose bricks from falling onto the sidewalk and street.

CTS's expert Richard J. Vivenzio, a New Jersey licensed architect, deposed that current safety codes require the church to have a thirty-six-inch front landing outside the main entrance, not the existing sixteen-inch landing from the church's original construction. He opined the landing was meant to keep someone from falling down the church's front steps "[b]ecause doors that open out could hit somebody." Vivenzio, however, testified historical buildings like the church are only subject to the safety codes that existed when they were built. He opined architects who renovate "an older building" need not "go back and change any part of that building to meet today's standards" unless they are "specifically hired to review and make the [building] compliant with today's codes." He professed CTS was not contracted "to evaluate the safety of the church," and its scope of work was limited to "certain aspects of repair work on the" church's façade, roof, and masonry. Thus, in Vivenzio's view, CTS did not need to advise the church defendants of safety risks from the main entrance or of an "[in]sufficient [front] landing."

The church's expert Harry T. Osborne, AIA, also a New Jersey licensed architect, deposed that, if constructed today, the church would need at least

6

"[eighteen] inches beyond the swing of a door of the landing width" to create a buffer space for someone opening the front doors to avoid hitting someone on the landing. Like Vivenzio, Osborne opined an architect hired to assess "parts of the building [that] are falling off and are unstable" would assess only "that portion of the building, not the entire building" or its entrance's compliance with "present code or any code."

After discovery closed, defendants moved to bar Aslanian's expert report as net opinion and for summary judgment dismissal of Schembari's amended complaint.[3] The judge found Aslanian's report summarily relied on "current[-]day [codes]" without explaining how those [codes] applied? to a church built long before they were implemented. The judge thus held Aslanian's report was an inadmissible net opinion, reasoning "he doesn't provide a basis for" his opinion that CTS or Ruiz-Ulloa "had a duty to tell" the church defendants "about the front door [being] . . . unsafe." Empathizing with Schembari's injury, the judge stated "the church [defendants] violated no duty and the expert clearly did not provide a basis for me to conclude that was even in the game. So, the matter is dismissed."

---

[3] CTS was the first to move to exclude Aslanian's expert testimony, thereafter St. Michael's cross-moved for the same relief.

A-0522-23

The judge issued separate orders: (1) granting summary judgment dismissal for CTS and dismissing all counterclaims and crossclaims against CTS with prejudice; (2) granting summary judgment dismissal for the church defendants and Ruiz-Ulloa and dismissing all counterclaims and crossclaims against them with prejudice; and (3) barring Aslanian's testimony as to Ruiz-Ulloa at trial and dismissing the complaint and crossclaims against Ruiz-Ulloa with prejudice.

II

We first consider the motion judge's determination that Aslanian's expert report was an inadmissible net opinion. "The admission or exclusion of expert testimony is committed to the sound discretion of the trial court." Townsend v. Pierre, 221 N.J. 36, 52 (2015) (citing State v. Berry, 140 N.J. 280, 293 (1995)). "As a discovery determination, a trial court's grant or denial of a motion to strike expert testimony is entitled to deference on appellate review." Ibid.

N.J.R.E. 703 requires an expert's opinion be "grounded in 'facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts.'" Id. at 53 (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). "The net

opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'"  Id. at 53-54 (alterations in original) (quoting Polzo, 196 N.J. at 583).  The rule "mandates that experts 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'"  Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)).  "An expert's conclusion 'is excluded if it is based merely on unfounded speculation and unquantified possibilities.'"  Ibid. (internal quotations omitted) (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)).

"[A] trial court must ensure that an expert is not permitted to express speculative opinions or personal views that are unfounded in the record."  Ibid. "[A]n expert offers an inadmissible net opinion if he or she 'cannot offer objective support for his or her opinions, but testifies only to a view about a standard that is personal.'"  Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014) (internal quotations omitted) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 373 (2011)); see also Riley v. Keenan, 406 N.J. Super. 281, 296 (App. Div. 2009) (explaining experts "must be able to point to

generally accepted, objective standards of practice and not merely standards personal to them").

"Evidential support for an expert opinion may include what the expert has learned from personal experience and training; however such experience, in turn, must be informed and given content and context by generally accepted standards, practices, or customs of the . . . industry." Satec, Inc. v. Hanover Ins. Grp., Inc., 450 N.J. Super. 319, 333 (App. Div. 2017). There must be some "authority supporting [the] opinion," which can take the form of "any document, any written or unwritten custom, or established practice that the [industry] recognize[s]." Ibid. "[T]he source of the standard of care enunciated, . . . by which to measure plaintiff's claimed deficiencies or to determine whether there was a breach of duty owed [by] defendant" must be identified. Id. at 334.

Applying these principles, we are convinced Aslanian's expert report is an inadmissible net opinion, thereby barring his testimony. There is no merit to Schembari's contention that Aslanian's report sufficiently explained his "methodology" for concluding CTS and Ruiz-Ulloa knew the church's main entrance was obviously unsafe and owed a duty to advise the church of this danger. Aslanian's report has "no support in factual evidence or similar data." Pomerantz Paper Corp., 207 N.J. at 372. He failed to identify a statute, code, or

generally accepted objective standards of practice requiring that architects employed or hired by the church must advise that it should comply with current safety codes that postdate construction of its sanctuary.  Therefore, Aslanian's bare assertions do not allow him to testify at trial to support Schembari's claims.

III

Having concluded that Schembari has no expert testimony to support her claims, we address her assertion that CTS and Ruiz-Ulloa owed an overarching duty to the church and its worshippers based on state codes governing architects: N.J.A.C. 13:27-5.1, requiring architects to "at all times recognize the primary obligation to protect the health, safety and welfare of the public in the performance of professional duties"; and N.J.A.C. 13:27-5.2, prohibiting architects from supporting their clients' decisions that violate building codes. Given that these codes were not cited by Schembari before the motion judge, we should not consider them now because they do not "go to the jurisdiction of the trial court or concern matters of great public interest."  Zaman v. Felton, 219 N.J. 199, 227 (2014) (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)).

Yet, even if we consider these codes, Schembari's reliance on them is without merit.  N.J.A.C. 5:23-6.1 to -6.33, specifically exempts the church from

current safety code requirements. N.J.A.C. 5:23-6.2(f) provides buildings "may continue in use and nothing herein shall be interpreted as requiring the repair, renovation, alteration or reconstruction of such building[s]" to comply with building codes adopted or amended after they were built. In addition, "repairs, renovations, alterations, [and] reconstruction" on an existing building must follow current code for the affected portions of the building. N.J.A.C. 5:23-6.2(c)(2). However, the rest of the building remains exempt from new building code requirements. N.J.A.C. 5:23-6.2(f).

IV

Turning to the motion judge's summary judgment bench decision, the judge cited no legal basis explaining that defendants were entitled to dismissal of Schembari's claims because Aslanian's expert report was an inadmissible net opinion. See R. 1:7-4(a) (the motion judge must, in "an opinion or memorandum decision, either written or oral, find the facts and state its conclusion of law thereon . . . on every motion decided by a written order that is appealable as of right"); R. 4:46-2(c) (applying Rule 1:7-4(a) to summary judgment motions). Nevertheless, we choose not to remand for the judge to explain his ruling because defendants' entitlement to summary judgment is clear. See Pressler & Verniero, Current N.J. Court Rules, comment 1 on R. 1:7-4 (2025) (citing Leeds

v. Chase Manhattan Bank, N.A., 331 N.J. Super. 416, 420-21 (App. Div. 2000) (affirming summary judgment even though order merely stated "denied")).

Schembari needed an expert's report to establish a prima facie case of professional malpractice by CTS and Ruiz-Ulloa for their failure to advise the church that its front entrance was unsafe because "technical, or other specialized knowledge [was needed to] assist the trier of fact to understand the evidence or to determine a fact in issue." N.J.R.E. 702. Whether the front entrance violated safety standards "is beyond the ken of the average juror." Hayes v. Delamotte, 231 N.J. 373, 390 (2018) (quoting State v. Kelly, 97 N.J. 178, 208 (1984)). As to CTS, the average juror does not know the scope of safety concerns regarding the front entrance that it should have addressed with the church when it was hired for the restoration project. As to Ruiz-Ulloa, the average juror does not know the scope of safety concerns regarding the front entrance that she should have addressed with the church in her role as the church's architect. Schembari also needed an expert's report to establish a prima facie case of negligence, gross negligence, and willful and wanton disregard of unsafe conditions against the church defendants for not having a reasonably safe front entrance. The average juror does not understand what safety concerns the church should have addressed given the safety codes Schembari relies upon to sustain her claims did

A-0522-23

not exist when the church was built decades before. With no expert testimony to present at trial, Schembari proffered no other evidence to support her claims against defendants.

V

Finally, we address the issue of charitable immunity. The church defendants and Ruiz-Ulloa argued in their summary judgment motion that they were immune from Schembari's simple negligence claims under the Charitable Immunity Act, N.J.S.A. 2A:53A-7 to -11, and, because she had not established gross negligence or willful and wanton conduct, summary judgment dismissal of the complaint was required. It is unclear how the motion judge decided the church defendants and Ruiz-Ulloa were entitled to charitable immunity. After ruling that Aslanian's expert report was an inadmissible net opinion, the judge merely said: "Now, as to the issue of charitable immunity, . . . there are allegations in the complaint, specifically count two and count four that talk about gross [negligence,] well without the report there is no allegations anymore. So, on the basis of that[,] I will dismiss the complaint in its entirety." Despite the uncertainty of the judge's charitable immunity ruling, see R. 1:7-4(a), we will not remand for clarification because it is clear the church defendants and Ruiz-Ulloa were entitled to charitable immunity.

A-0522-23

The church and the Diocese are nonprofit organizations formed for religious purposes and Schembari's injury was incurred when she was attending Sunday mass. See N.J.S.A. 2A:53A-7(a); see also Green v. Monmouth Univ., 237 N.J. 516, 529-31 (2019). Ruiz-Ulloa was entitled to charitable immunity as a church employee. See N.J.S.A. 2A:53A-7(a). Concluding that Schembari cannot make a prima facie case for negligence, it logically follows that she would also fail to make a prima facie case for gross negligence or willful and wanton conduct.

Gross negligence is defined as "conduct that comes somewhere between 'simple' negligence and the intentional infliction of harm, or, 'willful misconduct.'" Ivy Hill Park Section III v. Smirnova, 362 N.J. Super. 421, 425 (Law Div. 2003) (citing Clarke v. Twp. of Mount Laurel, 357 N.J. Super. 362, 369-70 (App. Div. 2003)). It requires "indifference to consequences," Banks v. Korman Assocs., 218 N.J. Super. 370, 373 (App. Div. 1987) (quoting State v. Gooze, 14 N.J. Super. 277, 282 (App. Div. 1951)), and may be equated with willful or wanton conduct. See Stelluti v. Casapenn Enters., LLC, 408 N.J. Super. 435, 457 n.6, (App. Div. 2009), aff'd 203 N.J. 286 (2010). Gross negligence has also been defined as "reckless disregard of the safety of others."

In re Kerlin, 151 N.J. Super. 179, 185 (App. Div. 1977) (citing State v. Linarducci, 122 N.J.L. 137 (Sup. Ct. 1939)).

Indeed, Schembari offered no proofs showing the church defendants and Ruiz-Ulloa knew the front entrance was a dangerous and hazardous condition but chose to disregard it or failed to exercise even slight care or diligence regarding it. A rational fact finder could not find the church and Ruiz-Ulloa's conduct constituted gross negligence by being indifferent or recklessly disregarding the welfare of its worshippers.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0522-23