# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3202-16T4

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

R.J.,

    Defendant-Appellant.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF H.H.H.,

    Minor.

_____

        Argued October 31, 2017 — Decided November 28, 2017

        Before Judges Yannotti, Carroll, and Mawla.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Passaic
        County, Docket No. FG-16-0088-16.

        Bruce P. Lee, Designated Counsel, argued the
        cause for appellant (Joseph E. Krakora, Public
        Defender, attorney; Mr. Lee, on the briefs).

        Viviane Sullivan, Deputy Attorney General,
        argued the cause for respondent (Christopher

S. Porrino, Attorney General, attorney; Jason Rockwell, Assistant Attorney General, of counsel; Ms. Sullivan, on the brief).

Christopher A. Huling, Designated Counsel, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Mr. Huling, on the brief).

PER CURIAM

Defendant R.J. ("Richard")[1] appeals from a March 15, 2017 judgment terminating his parental rights to H.H.H. ("Harold"). For the reasons that follow, we affirm.

I.

The following facts are taken from the record. The New Jersey Division of Child Protection and Permanency (Division) has been involved in this matter since Harold's mother, T.H. ("Tiffany"), was nine months pregnant.

Tiffany struggled with substance abuse problems. Specifically, she used cocaine, benzodiazepines, and heroin during her pregnancy. She had participated in a methadone treatment drug program since July 2011, but had limited success.

Tiffany gave birth to Harold in February 2012. However, because she tested positive for opiates, cocaine, and benzodiazepines eight days earlier, a hospital worker made a

---

[1] We use pseudonyms or initials to protect the child and the parties' privacy.

referral to the Division. When the Division case worker met with Tiffany in the hospital, the case worker inquired about the baby's father. Tiffany stated she was unsure who the father was, but thought it could be either "Sugar" or "Thunder." Tiffany did not know their real names or addresses.

Harold was not discharged from the hospital because he was experiencing withdrawal symptoms. Tiffany was discharged and entered into another counseling and substance abuse program. As a result, the court granted the Division custody of Harold.

Tiffany and Harold were reunited because she was complying with treatment, but the reunification was short-lived. A second removal occurred on April 15, 2013, after Tiffany tested positive for opiates. At the time of the second removal, Richard had been living with Tiffany. However, Tiffany maintained she did not know the identity of Harold's biological father, and that he was not involved in the child's life.

One year later, Tiffany continued to struggle with substance abuse. Therefore, the Division continued to inquire about the child's father. Tiffany insisted she did not know who the father was. When asked specifically if Richard was the father, Tiffany stated he was not, but that Richard had "been a major part of [Harold's] life [and] fits the role of his father."

A-3202-16T4

A third removal occurred on April 29, 2014, when Tiffany was incarcerated for prostitution and drug possession. Harold was placed in a resource home. For the first time, Tiffany stated Richard was Harold's biological father.

On May 16, 2014, Harold was moved to K.M.'s home. K.M. was a family friend who knew Harold from his daycare center. The Division also contacted the paternal grandmother as a potential resource placement for Harold, but she informed the Division she was unable to care for him due to her and her husband's health. The paternal grandmother stated she had another son who may be interested, but he and his wife were busy.

Tiffany was released from jail on May 20, 2014, but was arrested again on June 3, 2014. Harold remained in K.M.'s care until December 1, 2014, when the court granted Tiffany physical custody on the condition she remain at and complete the mommy-and-me program and attend a psychological evaluation. Later that month, Tiffany indicated she wanted to leave the program to pursue a culinary arts program. In the following months, Tiffany experienced numerous relapses, and Harold was once again removed from her care on October 23, 2015, and again placed with K.M.

After Tiffany informed the Division Richard was the father, the Division attempted to locate him. The paternal grandmother

was unaware of his whereabouts, but stated he was abusing drugs. Tiffany corroborated this claim, stating Richard abused heroin.

On February 17, 2015, the caseworker located Richard and reported that he wished to attend the next scheduled court proceeding. However, on April 14, 2015, a caseworker visited Richard who would not open his front door completely, and indicated he would not attend the next court date. The caseworker served Richard with the complaint and court ordered paternity test. Richard indicated he would comply with the test and also acknowledged paternity.

A paternity test was scheduled for July 6, 2015, but Richard failed to appear. Another test was rescheduled for August 3, 2015, but again Richard failed to appear despite a call from a caseworker reminding him of the appointment. The paternity test was rescheduled again for November 13, 2015; however, the Division learned Richard was incarcerated on November 12, 2015. As a result, the caseworker visited Richard in jail on November 24, 2015, and provided him with the most recent court order. Richard agreed to comply with the paternity testing, which occurred on December 1, 2015, and confirmed he was Harold's father.

Richard was released on December 15, 2015. That same day the paternal grandmother reported finding Richard lying on the floor

of her home gurgling and under the influence of a substance. She called an ambulance, but Richard refused medical attention.

On January 4, 2016, the Division assessed the paternal grandmother's home as a possible placement for Harold since Richard had been living there at the time. However, the Division ruled out the paternal grandmother as a potential placement for Harold because her home did not meet licensing standards, and she indicated she needed Richard's help to care for her husband, who was ill and had limited mobility. After the paternal grandmother's husband passed away, she sought to be reevaluated as a potential placement, but when the caseworker visited her she withdrew her request.

The Division also investigated M.G., the mother of Richard's other two children, as a placement option. However, a psychological evaluation of M.G. concluded she was not a suitable caregiver for Harold, and that he should not be removed from his resource parent.

During this time, Richard had been offered visitation with Harold, but had not responded or requested any visits. When the Division inquired why Richard did not exercise visitation, he claimed he did not have a driver's license. The Division offered Richard bus passes and encouraged him to visit Harold, but Richard

attended only two visits, one each in January 2016 and February 2016.

In addition to exploring relative placements and offering visitation, the Division referred Richard to participate in a substance abuse assessment. Richard was notified of the evaluation, which was scheduled for January 28, 2016, but he failed to attend. The Division scheduled seven more substance abuse assessments for Richard between February and August 2016 — all of which he failed to attend.

In addition, Richard was scheduled for a psychological evaluation with Robert Miller, Ph.D. Richard received written notice of the evaluation, but failed to attend.

On August 22, 2016, Richard provided a urine sample and tested positive for methadone, opiates, cocaine, and benzodiazepines. Richard was tested seven more times between September 6, 2016 and October 17, 2016, and tested positive for opiates and cocaine on six of the dates and benzodiazepines on one date. Richard tested positive for opiates again on three separate occasions in October 2016 and November 2016, respectively. In December 2016, Richard tested positive for opiates, cocaine, and benzodiazepines.

Dr. Robert Kanen conducted a psychological evaluation of Richard on behalf of the Division, which included a clinical interview, and administering the Wechsler Adult Intelligence Scale

(WAIS-V) and the Millon Clinical Multiaxial Inventory-III (MCMI-III). Dr. Kanen found Richard had borderline intelligence, which would pose a challenge in his daily life and likely make difficult his ability to support himself and Harold. In addition, Dr. Kanen noted Richard had longstanding personality problems, including self-centeredness, indifference to the needs of others, and deficits in coping with the demands of daily life. Dr. Kanen concluded, "[Richard] is not likely to be able to provide [Harold] with a permanent, safe, and secure home now or in the foreseeable future. He is likely to expect others to take over his parental responsibilities" and "[h]is child . . . does not know him as a predictable, consistent and reliable caretaker." Therefore, Dr. Kanen did not recommend Harold be placed in Richard's care.

The bonding evaluation Dr. Kanen performed between Richard and Harold demonstrated there was no bond. Dr. Kanen concluded Harold would not likely suffer serious or enduring harm if permanently separated from Richard.

The guardianship trial occurred on January 31, and February 1, 2017.[2] The only testimony presented was on behalf of the Division, which offered testimony from Dr. Kanen, Jennifer Zajonc, a Division caseworker, and Jorge Flaconi, a Division adoption

_____

[2] Tiffany provided an identified surrender of parental rights regarding Harold to K.M. on December 2, 2016.

caseworker. The trial judge issued a written opinion on March 15, 2017, terminating Richard's parental rights.

The judge found the Division had proven all four prongs of the best interests test by clear and convincing evidence. As to the first prong, the judge found Richard was not meaningfully involved in Harold's life, failed to maintain stable, independent housing, and as an active substance abuser, continued to place Harold at risk of harm. As to the second prong, the judge concluded Richard was unwilling to remediate the harm. He found Richard intentionally delayed his paternity testing, and noted his lack of attendance for drug screenings and substance abuse assessments, as well as his inconsistent exercise of visitation.

Regarding the third prong, the judge found Richard had failed to comply with the Division's attempts to provide substance abuse treatment and services, and recounted the court's consideration of alternatives to termination concluding adoption is both feasible and likely, and would provide Harold with the greatest degree of permanency. As to the fourth prong, the judge found Richard would likely be unable to provide Harold with a permanent, safe and secure home for the foreseeable future, and Harold would not suffer serious and enduring harm if permanently separated from Richard. This appeal followed.

The scope of our review on an appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). We will uphold a trial judge's factfindings if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014) (citing N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). No deference is given to the court's "interpretation of the law" which is reviewed de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012) (citing N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 183 (2010); Balsamides v. Protameen Chems., 160 N.J. 352, 372 (1999)).

"We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2014) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." E.P., 196 N.J. at 104 (quoting G.L., 191 N.J. at 605). We also accord deference

to the judge's credibility determinations "based upon his or her opportunity to see and hear the witnesses." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006) (citing Cesare, 154 N.J. at 411-13).

When terminating parental rights, the court focuses on the "best interests of the child standard" and may grant a petition when the four prongs set forth in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence. In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999). "The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." Id. at 348.

### III.

Richard argues the trial judge erred by denying him the opportunity to hire a private attorney. On the first day of trial, Richard appeared with assigned counsel and informed the trial judge he wished to seek private counsel. He claimed his assigned counsel was unable to represent him effectively.

The trial judge inquired if Richard was able to afford a private attorney, and Richard replied his brother would pay for the attorney. The judge then inquired whether Richard had spoken to an attorney and Richard conceded he had not. The judge denied

Richard's request reasoning that a lengthy delay had already occurred "with respect to the resolution of permanency and stability for the child," which outweighed Richard's request to begin a search for private counsel.

On appeal, Richard argues the trial judge's decision to deny an adjournment was an abuse of discretion under State v. Kates, 426 N.J. Super. 32, 45 (App. Div. 2012), because the court failed to undertake "an intensely fact-sensitive inquiry." Richard argues the judge erred by failing to inquire whether his current counsel was "prepared to provide effective representation, and if she was, what her expectations were for how much time a new attorney would need to prepare."

We review a trial judge's denial of an adjournment request under an abuse of discretion standard. State v. Ferguson, 198 N.J. Super. 395, 402 (App. Div. 1985). A reversal is not warranted unless we determine: 1) whether the judicial ruling was "clearly unreasonable in the light of the accompanying and surrounding circumstances," and 2) whether a defendant was prejudiced by the denied adjournment request. State v. Miller, 216 N.J. 40, 66-67 (2013). Prejudice is established when a "defendant suffer[s] manifest wrong or injury." Id. at 67. When a litigant seeks an adjournment to retain new counsel, we have stated:

> Some of the factors to be considered in the balance include: the length of the requested delay; whether other continuances have been requested and granted; the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court; whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; whether the defendant has other competent counsel prepared to try the case, including the consideration of whether the counsel was retained as lead or associate counsel; whether denying the continuance will result in identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature; the complexity of the case; and other relevant factors which may appear in the context of any particular case.
>
> [State v. Kates, 426 N.J. Super. 32, 46 (App. Div. 2012) (quoting State v. Hayes, 205 N.J. 522, 538 (2011))].

Here, there is no evidence the trial judge abused his discretion by denying Richard's request to delay trial to pursue private counsel. First, Richard provided no legitimate reasons for needing new counsel. He baldly claimed he wanted a private attorney because he felt his current counsel could not adequately represent him without providing any specific reason. His brief on appeal also does not substantively address the Kates factors to convince us the trial judge erred by refusing to delay the trial. No objective evidence is asserted demonstrating trial counsel was unprepared or otherwise ineffective. The record lacks

evidence of prejudice to Richard due to the denial of his adjournment request.

Second, the record demonstrates the trial judge balanced Richard's request against Harold's right to permanency. Regarding permanency, the Supreme Court has stated there are "strong policy considerations that underscore the need to secure permanency and stability for the child without undue delay." In re Guardianship of DMH, 161 N.J. 365, 385-86 (1999). N.J.S.A. 30:4C-15(d) provides that permanency must be achieved within a period of one year from removal where a parent has failed to remedy the conditions causing the removal. Therefore, the trial judge's decision to deny Richard's request for a continuance was not an abuse of discretion considering Harold had been in placement with K.M. since November 2015, and in excess of one year.

IV.

Richard challenges the trial judge's findings on the first prong of the best interests standard. This prong requires the Division to establish that "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1). "[T]he Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'"

14

N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352).

Richard argues Dr. Kanen's report and testimony were "impermissible net opinion[s]" pursuant to Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014), because he relied on an intelligence assessment which "lack[s] psychological certainty." He argues the assessment was faulty because it contained inherent contradictions finding Richard had borderline intelligence, yet he managed to maintain gainful employment. Richard also argues the test results were invalid because Dr. Kanen reported Richard was under the influence when the testing was administered. We find these arguments lack merit.

The exclusion of net opinions is "a prohibition against speculative testimony." Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997). Therefore, the expert's conclusions must be based on "(1) the expert's personal observations, or (2) evidence admitted at trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts in forming opinions on the same subject." Davis, 219 N.J. at 410 (citation omitted). In other words, "experts generally [] must be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology

are scientifically reliable." Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992).

Here, Dr. Kanen's evaluation included a clinical interview, the WAIS-V and MCMI-III tests, a bonding evaluation between Richard and Harold, and a review of the Division's records. There is no evidence Dr. Kanen relied on any information outside of his observations or outside of the record to formulate his opinion. As the trial judge noted:

> Dr. Kanen . . . administered standard psychological intelligence testing to [Richard]. Dr. Kanen took pains to point out [Richard's] parenting deficits in his written evaluation. Dr. Kanen reported that [Richard's] verbal comprehension index was below 98% of the general population and . . . [h]is perceptual reasoning index was below 92% of the general population . . . [h]is estimated full scale IQ was 74, which is in the borderline range and below 96% of its general population. Dr. Kanen opined that at this level of cognitive ability daily life is likely to be a challenge for him; he is likely to have difficulty independently supporting even himself and thus the child as well. He has a history of unstable housing, [and] difficulty functioning in daily life.

The record demonstrates Dr. Kanen drew his conclusions regarding Richard's intelligence and daily cognitive abilities from the results of the WAIS-V and MCMI-III tests. Richard's ability to maintain employment was not mutually exclusive of his lengthy history of unstable housing and substance abuse, or the

16

characteristics Dr. Kanen associated with borderline intelligence. Dr. Kanen's opinion was not based on speculation and was not a net opinion.

Richard's argument that harm under prong one was not proved is also without merit. It is well settled the Division need not demonstrate actual harm in order to satisfy prong one. N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 440 (App. Div. 2001). Rather, the focus under the first prong is not on any "single or isolated harm," but rather on "the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348 (citing N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-10 (1986)). The harm may be established by "a delay in establishing a stable and permanent home." DMH, 161 N.J. at 383.

Furthermore, "[a] parent's withdrawal of [] solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." Id. at 379 (citing K.H.O., 161 N.J. at 352-54). Additionally, a parent's "persistent failure to perform any parenting functions and to provide . . . support for [the child] . . . constitutes a parental harm to that child arising out of the parental relationship [that is] cognizable under N.J.S.A. 30:4C-15.1(a)(1)

and (2)."  DMH, 161 N.J. at 380-81 (citing K.H.O., 161 N.J. at 352-54).

Here, the record establishes Harold was harmed by Richard's absence from his life.  The trial judge found "the conduct of [Richard] throughout the entire period of the Division's history with the family has met th[e] standard [for prong one] 'on all fours.'"  The judge recounted that Richard did not identify himself as Harold's father for the first two years of his life and had contemplated an identified surrender.  The judge stated Richard "seems to have been uninvolved in [Harold's] life to any meaningful degree."

The judge noted Richard's lack of a relationship with Harold was demonstrated through Dr. Kanen's psychological and bonding evaluation.  In addition, Dr. Kanen found Richard would harm Harold because Richard permitted Tiffany to be Harold's sole caregiver knowing she had severe substance abuse problems.  The judge stated:

> The evidence is clear that [Richard] was fully aware of [Tiffany's] ongoing . . . substance abuse problem and took no action at all to put himself in a position to care for his own son. In fact, . . . [Richard] admitted to never having complied with services; stating he was just waiting for [Tiffany] to do so.

The judge credited Dr. Kanen's unrebutted conclusion that returning Harold to Richard would expose him to an unnecessary risk of harm.

In DMH, 161 N.J. at 379, the father failed to parent and left his child with the mother when he knew they were living in deplorable conditions. The Court concluded the father's "failure to perform any parenting functions and to provide nurture, care, and support constitute[d] a parental harm to [the] child arising out of the parental relationship" which satisfied N.J.S.A. 30:4C-15.1(a)(1).

Here, Richard also willfully chose not to parent or come to the aid of Harold. His withdrawal from Harold subjected him to harm inflicted by Tiffany's drug abuse and the instability of four removals. As the trial judge found, Richard never nurtured or cared for the child, and "during the entire period the Division[] [was in] contact with the family, [never] maintained stable, independent housing where he could provide a suitable home for Harold." Accordingly, the trial judge correctly found that the Division established harm under the first prong of the best interests standard.

V.

The third prong of the best interests of the child standard requires the Division to establish that it made reasonable efforts to help the parent correct the circumstances that led to the child's removal from the parent's care, and "considered alternatives to termination of parental rights." N.J.S.A. 30:4C-

15.1(a)(3). The Division's efforts must be analyzed "with reference to the circumstances of the individual case," including the parent's degree of participation. DMH, 161 N.J. at 390.

N.J.S.A. 30:4C-15.1(c) defines diligent efforts as those reasonable "attempts by an agency authorized by the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure[.]" The statute lists examples of "reasonable attempts" at reunification, including but not limited to:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development and health; and
>
> (4) facilitating appropriate visitation.
>
> [Ibid.]

Richard argues the Division's failure to make reasonable efforts to investigate his brother as a placement for the child was a violation of N.J.S.A. 30:4C-12.1. Richard likens his case to N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 581-82 (App Div. 2011), where we stated "the Division's statutory obligation does not permit willful blindness and

inexplicable delay in assessing and approving or disapproving a relative known to the Division[.]"

Here, however, the Division met its burden of reasonable efforts to search for a relative placement for the child. First, as we noted, from the inception of the Division's involvement with Tiffany in 2012, the Division sought to identify Harold's father. The record demonstrates the Division persisted in its efforts, but was not able to identify Richard as the father until April 2014. Even then, Richard's whereabouts were unknown until February 2015, because the Division could not find him. Indeed, the record demonstrates Richard frustrated the Division's efforts to share and obtain information from him by failing to answer telephone calls or inform the Division of his whereabouts, which limited the Division's ability to explore relative placements.

Once Richard was identified, the record demonstrates he delayed any progress the Division could make by failing to appear for several paternity tests and failing to remain in contact with the Division altogether. It was not until December 1, 2015, when Harold was nearly four years old, and while Richard was incarcerated, that paternity testing was performed which determined Richard to be the father. Richard was the cause of the delay.

When the Division was able to locate a relative, the paternal grandmother, she at first rejected the notion of being a resource for Harold, and then was ruled out as a placement. Although, Richard's brother was suggested by the paternal grandmother as a resource, he never presented himself to be evaluated. Also, Richard did not request his brother be evaluated.

N.J.S.A. 30:4C-12.1(a) requires the Division search for and assess relatives as potential placements; however, the Division is not obligated "to search the fifty states or even the twenty-one counties to identify [relatives]." K.L.W., 419 N.J. Super. at 582. For these reasons, we are not persuaded the Division failed to make reasonable efforts to bring about family reunification.

Richard also argues the Division "did not undertake reasonable efforts to develop a plan for services in violation of its statutory responsibilities under N.J.S.A. 30:4C-15.1(c)." We disagree.

The determination whether the Division's efforts were sufficient is a fact sensitive inquiry. D.M.H., 161 N.J. at 390. The Division need only provide "coordinated" services with a "realistic potential" of success. N.J. Div. of Youth & Family Servs. v. J.Y., 352 N.J. Super. 245, 267 n.10 (App. Div. 2002). Success is not guaranteed as "even [the Division]'s best efforts

may not be sufficient to salvage a parental relationship." F.M., 211 N.J. at 452.

The Division offered Richard numerous services once he was identified as the father, and a road map for reunification with Harold. However, when this possibility was raised, Richard informed the case worker "there's nothing I can do." Nevertheless, the Division encouraged visitation, and offered Richard bus passes so he could see Harold more often, substance abuse evaluations and treatment, and psychological evaluations. Richard failed to take advantage of services. He missed numerous scheduled appointments for paternity testing, substance abuse, psychological evaluations, drug screenings and frequently missed visitation.

Thus, the trial judge concluded: "[B]ased on the evidence of continuing substance abuse, unstable and unidentified housing by [Richard] and the results of his bonding and psychological evaluations, it would not be possible to place [Harold] in his care." For these reasons, the Division proved by clear and convincing evidence prong three of the best interests standard. N.J.S.A. 30:4C-15.1(a)(3).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3202-16T4