**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3405-22

TOM BROOKS, as Administrator
Ad Prosequendum of the ESTATE
of TAHERA CLARK-BROOKS,
deceased,

      Plaintiff-Appellant,

v.

SCOTT R. LONGCOR and
EDWARD CATON, JR.,

      Defendants-Respondents.

_____

Submitted January 15, 2025 – Decided January 29, 2025

Before Judges Mayer and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-3870-18.

Messa & Associates, PC, attorneys for appellant (Ramon A. Arreola, on the briefs).

McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys for respondents (Michael J. Marone, of counsel and on the brief; Sandra D. Lovell, on the brief).

PER CURIAM

Plaintiff Tom Brooks, administrator ad prosequendum of the estate of his daughter, Tahera Clark-Brooks (plaintiff's daughter or decedent), appeals from a June 23, 2023 order denying his motion for a new trial and in limine determinations by the trial judge during the course of the trial. We affirm all orders on appeal.

Early in the morning on November 19, 2016, decedent's car collided with a truck owned by defendant Scott R. Longcor and operated by defendant Edward Caton, Jr. Tragically, plaintiff's daughter died shortly after her car collided with the truck.

Caton worked as a truck driver for Longcor. At 3:00 p.m. on November 18, 2016, Caton received an assignment to transport an oversized load of lumber from Berlin, New Jersey to Chester Springs, Pennsylvania. The lumber was to be delivered by 8:00 a.m. the following day. Caton left Berlin at 4:00 p.m. on November 18, intending to drive until he reached a truck stop about "[thirty-five] to [forty] minutes" from the start of his journey.

At approximately 4:15 p.m. on November 18, Caton encountered heavy traffic. Thirty minutes later, Caton entered I-295, traveling southbound. Based

on the heavy traffic conditions, Caton realized he would not reach the intended truck stop before nightfall.[1]

At 5:00 p.m., Caton pulled the truck off the highway and onto the roadway's shoulder just past the entrance ramp from I-70 to I-295. After parking the truck on the roadway's shoulder, Caton placed three reflective safety triangles along the shoulder to "divert traffic." Caton placed the triangles at fifty, seventy, and ninety feet from the rear of the truck. Additionally, Caton kept the truck's amber strobe lights activated "for safety" because the truck was parked on the shoulder of the road. Caton then went to sleep in his truck's cabin.

Early in the morning on November 19, plaintiff's daughter travelled southbound on I-295 in her car. At 4:18 a.m., decedent's car crossed the white reflective fog line separating the highway from the shoulder and collided with the trailer portion of Caton's truck. Decedent sustained multiple injuries and was pronounced dead about one hour later. Blood testing revealed decedent had a blood alcohol content (BAC) level of .054 at the time of her death.

---

[1] Travel restrictions on trucks carrying large loads, as was Caton's truck on the day of the accident, prohibited traveling on roadways after dark. We take judicial notice that the sun sets in New Jersey around 4:30 p.m. in the month of November.

On October 11, 2018, plaintiff filed a wrongful death and survival action against defendants. Defendants filed an answer, asserting the death was "the result of [decedent's] contributory/comparative negligence" and plaintiff's claims were barred by the New Jersey Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8.

The parties exchanged discovery. On March 23, 2023, the parties took the de bene esse testimony of defendants' expert, Dr. John Brick. Dr. Brick, a forensic psychopharmacologist, opined decedent "was intoxicated and impaired at the time of the crash." Dr. Brick relied on demonstrative exhibits during his de bene esse testimony, including a chart titled "Biobehavioral Effects of Alcohol Intoxication" (Behavioral Effects chart). The Behavioral Effects chart described the effects of alcohol consumption at different BAC levels. Dr. Brick also relied on a chart entitled "Relative Injury Risk: Effect of Mode, Age, Gender and BAC" (Relative Risk chart). The Relative Risk chart depicted relative risk scores for fatal motor vehicle accidents across different demographics and BAC levels.

In Limine Motions

Prior to the trial, the parties filed several in limine motions, which the trial judge entertained on April 17 and 19, 2023. One of plaintiff's in limine

A-3405-22

applications sought to exclude evidence of decedent's BAC under <u>Gustavson v. Gaynor</u>, 206 N.J. Super. 540 (App. Div. 1985). The judge denied the motion, finding admission of decedent's BAC proper because decedent's car, while traveling in a "straight lane," hit a truck parked "partially on the grass" and indicated by reflective "[t]riangles." Additionally, the judge noted "the tractor trailer would not have been invisible to a sober driver driving straight in the right[-]hand lane" and concluded sufficient supplementary evidence warranted admission of decedent's BAC under <u>Gustavson</u>.

In another in limine application, plaintiff moved to exclude Dr. Brick's testimony regarding the relative risk of driving with a .054 BAC. Plaintiff argued Dr. Brick's testimony failed to "take into consideration substantially similar accidents" involving "fatal crashes of people driving off the roadway . . . and hitting a parked vehicle." The judge denied the motion, explaining:

> Nobody could possibly realistically somehow try to cull . . . from [] [100 million] accident reports and make some type of subjective determination as to which accidents were close to this one. That doesn't happen in the real world. To me, it's far more understandable that there are some statistics out there which will give a relative risk of somebody who'd be involved in an automobile accident, which has the added bad factor of a death because [their BAC is] .05. On its face, it doesn't sound like it's something that can't be calculated. So I reject the . . . argument that somehow these numbers are meaningless unless the expert

5

obtains thousands of records concerning people who get involved in an accident because they're driving at four o'clock in the morning, at .05, and there is a tractor trailer on the shoulder of the roadway with or without cones . . . .

. . . .

The probative value of the . . . relative risk is simple. [It's] that at that level of intoxication[,] . . . the risk of the person getting involved in an accident which coincidentally involves a death is . . . higher than . . . that of a stone[-]cold sober driver.

Plaintiff also sought to exclude Dr. Brick's testimony as improper net opinion. Plaintiff's counsel asserted, "there [we]re no eyewitness observations to [say] that [decedent] drove, or presented a picture of being impaired in any fashion other than the accident itself and that there are a number of reasons unrelated to alcohol that could have led [decedent] off the roadway." Thus, plaintiff's counsel contended the BAC "evidence shouldn't be admissible in any fashion."

The judge denied this in limine motion. He explained:

[A]dmitting . . . all this evidence in is[,] I think, consistent with the holding in Gustavson . . . .

Narrowly focused, the issue is whether or not the facts of this case, as a jury could find them, [are] sufficient, quote, "supplementary evidence." . . .

[T]raveling onto the shoulder of the road at four o'clock in the morning . . . could [have] any number of

6

explanations . . . , but one certainly is that it was due to the . . . impaired state . . . of the decedent. I think it meets the test of Gustavson. . . . I think this is closer to a situation where the evidence warrants it as opposed to the evidence not warranting it.

Trial Testimony

The matter was tried before a jury over eight days from April 20, 2023 through May 3, 2023. Plaintiff called Caton as his first witness. Caton testified regarding the events of November 18 and 19, 2016. On cross-examination by defense counsel, Caton explained he pulled onto the highway's shoulder because (1) his permit did not allow him to drive off-route or after dark, (2) the size of the truck's load necessarily precluded his truck from entering a hotel's parking lot, and (3) he feared "[s]omebody would run into the load or run into [him] . . . [i]f [he] kept driving."

Additionally, plaintiff called New Jersey State Police Detective Sergeant Paul Applegate as a witness. Applegate responded to the scene of the collision and investigated the accident. On cross-examination, Applegate testified he saw no skid marks, yaw marks,[2] scrapes, or gouges along the roadway near the collision.

---

[2] The detective explained a "yaw mark" was a "friction mark on [a] roadway" left by rotating tires.

Plaintiff also presented expert testimony from Dr. Michael Coyer, a forensic toxicologist and pharmacologist. Dr. Coyer testified the alcohol in decedent's blood was "the equivalent of [about] one and one[-]half drinks." According to Dr. Coyer, decedent's BAC was "relatively low" but could cause "decreased inhibitions" and "mild euphoria" without "visible signs of intoxication." Dr. Coyer testified a BAC reading alone, if below .08, was insufficient to determine alcohol impairment. However, on cross-examination, Dr. Coyer conceded "someone could[] have a [BAC] level of below .08 and still show signs of impairment."

Defendants presented the de bene esse testimony of Dr. Brick as their sole trial witness. According to Dr. Brick: "A blood alcohol level of .054 percent [was] significant in that it is well known that there is impairment in multiple domains of human behavior at that concentration." Dr. Brick explained the concentration of alcohol in decedent's blood was "associated with impaired motor vehicle operation." He also testified, "the very nature of this accident" indicated some level of impairment. He explained there was a "known relationship between intoxication and risk for [a] fatal crash." Based on his experience and training, Dr. Brick concluded decedent "was intoxicated and impaired at the time of the crash."

Relying on the Behavioral Effects chart, Dr. Brick testified:

> [W]ith increasing blood alcohol concentrations there are different associated effects, starting with very, very low effects, including relative risk for some motorists of having crashed. And . . . while impairments may be present in some individuals, especially at these very low concentrations, those types of impairments would not be observable by common observation. You would need special tests or challenges, like driving a car.

Dr. Brick stated "it's very well known that there is impairment in motor vehicle operation at 0.04 percent or higher. There's an increased risk." He further explained "decades of research" have examined the effects of alcohol, including laboratory studies on "eye-hand coordination," "driver simulator tests," and "highway epidemiology, or studies on failed crashes." Relying on that research, Dr. Brick testified "there is impairment and increased risk at blood alcohol levels of .05 percent or more in the overwhelming majority of drinkers in this country."

When asked if the inability to maintain a lane of travel along a roadway might indicate some level of driver intoxication, Dr. Brick responded it "is certainly an indication of divided attention failure, where the person is driving down the roadway and they're not correcting for . . . changes in the road contour, or they're not detecting and correcting for the fact that they are moving out of the lane." According to Dr. Brick, "divided attention failure and the resulting

9 <span>A-3405-22</span>

driving out of your lane or doing any number of other things is consistent with alcohol intoxication."

Using the Relative Risk chart, Dr. Brick explained that alcohol consumption "increase[d] the risk for injury" in accidents involving boats, motor vehicles, slip and falls, or bicycles. Further, he stated "the risk increases . . . exponentially, meaning that when the blood alcohol level goes up by a small amount[,] .01 or .02 percent, the increase in risk can be very large." In this case, Dr. Brick testified, decedent's "blood alcohol level was just over .05 percent . . . [,] at which blood alcohol concentration . . . her relative risk . . . [was] more than four times greater compared with being sober."

Dr. Brick also opined decedent's alcohol consumption likely caused her to suffer "divided attention failure." According to Dr. Brick, "[w]hen you are sober, the ability to divide your attention among . . . different required components of driving is okay. . . . But when you're intoxicated, your ability to do that is narrow." According to Dr. Brick, a driver suffering from divided attention may "not realiz[e] that the road in front of you has turned and you're not turning with it, or you are driving down the roadway and your vehicle has turned and is leaving your lane of travel." He explained leaving the lane of travel and the roadway completely and then colliding with another object "is a

10

classic example of a divided attention failure and describes what happened in this case. And those consequences are well[-]known events that follow intoxication."

According to Dr. Brick, decedent's BAC of 0.05 meant she was driving while impaired and displaying divided attention. He further opined decedent's driving behavior prior to the collision "clearly demonstrate[d] that she lost control of her vehicle. She was not paying attention." While Dr. Brick stated there were other conditions that might contribute to a motor vehicle accident, such as fog, weather, or mechanical failure, "none of those things were present."

Dr. Brick concluded decedent:

> apparently . . . failed to process and respond to a parked tractor trailer off the roadway. She apparently failed to detect and correct her lane excursion. She left the roadway, drove onto the shoulder of the highway and rear[-]ended the truck.
>
> [T]here were no issues with regard to the lane markings. They were clearly identified according to the . . . reports that I read. According to the New Jersey State Police investigation report, the [truck] was visible because of marked reflective triangles and the strobe.

After considering the testimony, the jury held defendants were forty-nine percent liable for the happening of the accident and decedent was fifty-one

percent liable. The percentage liability resulted in a no-cause verdict on plaintiff's claims against defendants.

New Trial Motion

Plaintiff moved for a new trial, arguing the admission of evidence as to decedent's intoxication was improper because it "did not present a picture of unfitness sufficiently clear that the probative value outweighed [the] significant prejudice." Plaintiff further argued "[t]here was no evidence . . . from any eyewitness that [decedent] exhibited any sign of impairment," asserting "the mere happening of an accident does not establish negligence." Plaintiff claimed Dr. Brick's Relative Risk chart improperly "suggest[ed] to the jury [that] the mere happening of an accident shows negligence."

Regarding Dr. Brick's testimony, plaintiff noted defendants' expert "didn't review an accident reconstruction analysis," "didn't review any eyewitness evaluations of [decedent's] consumption of alcohol," and "didn't review the testimony of the investigating officers or the [S]tate [P]olice." Plaintiff claimed Dr. Brick's "opinion that alcohol was a significant contributing factor" to the happening of the accident amounted to impermissible net opinion. Plaintiff further asserted Dr. Brick rendered his conclusions "without reviewing any facts that because alcohol can impair people at certain levels, that [decedent]

was impaired based on her blood alcohol level."  Plaintiff also argued Dr. Brick failed to "cite a single bit of literature or evidence or anything that says that at the level that [decedent] was at, that she would have been impaired . . . 'to a reasonable degree of medical certainty.'"

In his new trial motion, plaintiff also challenged the admission of testimony that Caton's daughter had autism.  He argued the testimony lacked any probative value "other than [to] make the jury feel sorry for him."  Under the circumstances, plaintiff asserted no curative instruction would have remedied the resulting prejudice, and a new trial was warranted.  Plaintiff further argued certain questions during defense counsel's cross-examination of Dr. Coyer were improper.

The judge denied plaintiff's motion.  In his statement of reasons placed on the record, the judge explained:

> A reasonable jury could have easily gone in the opposite direction.  Whether it would be [fifty-one/forty-nine] in the opposite direction or [sixty/forty], who knows?  . . .
>
> There were various motions that were made.  I . . . would have been shocked by a [ninety/ten] or a [ninety-five/five].  And I think . . . I told the attorneys they better hope it's not [one hundred/zero] either way [be]cause then I really do have to do something about that.

13

> This was never [a one hundred/zero] case. It was never a [ninety/ten] case. I don't know what my pain threshold would [have been] in terms of vacating a jury verdict [if] the liability split was so off the mark. But I saw this, frankly, as somewhere in the [fifty/fifty] ballpark, which meant that it could have easily been [fifty-five/forty-five] in either direction, [fifty-two/forty-eight]—whatever it might be—[sixty/forty].

Regarding his ruling that Dr. Brick's testimony did not constitute impermissible net opinion, the judge stated the testimony comported with "anybody's common[], sensible understanding of the [e]ffect that alcohol has on . . . somebody's motor skills." Thus, the judge stated his evidentiary ruling on the issue was "somewhat inconsequential" to the outcome of the case.

On the other hand, the judge agreed his in limine ruling regarding the admission of decedent's alcohol level "could very well have impacted the outcome" of the case. The judge conceded that if his "ruling concerning the admission of the alcohol was erroneous, [he] would agree that that evidence was so prejudicial that the jury verdict should be vacated." However, the judge stated none of his "other evidentiary rulings ha[d] the clear capacity to render a miscarriage of justice."

On appeal, plaintiff raises the following arguments: the judge erred in admitting evidence of decedent's alcohol consumption; the judge erred in admitting the net opinion testimony of Dr. Brick; the judge erred in permitting

14

Dr. Brick's increased risk testimony; he is entitled to a new trial based on the unfair and prejudicial testimony revealing Caton's daughter is severely autistic; he is entitled to a new trial based on defendants' violations of the judge's in limine rulings; and the verdict is against the weight of the evidence. We reject these arguments.

I.

We first address plaintiff's argument the judge erred in denying his in limine motion to exclude evidence of decedent's alcohol consumption. He argues the judge misapplied Gustavson without considering "the plethora of evidence which would support that alcohol had nothing to do with the crash." Plaintiff contends a sober driver could have crashed into a commercial vehicle parked on the side of the road just as decedent had.

We review "a trial court's evidentiary rulings, like those at issue here, with substantial deference and will not overturn such a ruling unless it constituted a clear abuse of discretion." Hrymoc v. Ethicon, Inc., 254 N.J. 446, 463 (2023). "An abuse of discretion 'arises on demonstration of manifest error or injustice,' or when 'there has been a clear error of judgment.'" Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019) (citations omitted) (first quoting Hisenaj v.

Kuehner, 194 N.J. 6, 20 (2008); then quoting State v. Brown, 170 N.J. 138, 147 (2001)).

Because "a trial court is granted broad discretion to determine both the relevance of the evidence presented and whether its probative value is substantially outweighed by its prejudicial nature," we "will reverse an evidentiary ruling only if it was so wide off the mark that a manifest denial of justice resulted." Ibid. (internal quotation marks omitted) (quoting Griffin v. City of East Orange, 225 N.J. 400, 413 (2016)). "We apply the same standard of review to in limine motions adjudicating the admissibility of evidence." Primmer v. Harrison, 472 N.J. Super. 173, 187 (App. Div. 2022). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

"Clearly, evidence of intoxication is relevant to the issue of negligent driving." Gustavson, 206 N.J. Super. at 544. However, the "mere fact that a driver had consumed some alcoholic beverages is by itself insufficient to warrant an inference that the driver was intoxicated and that the intoxication was of such a degree as to render him unfit to drive at the time of the accident." Id.

at 545.  Indeed, "[d]runkenness alone . . . is not negligence.  A drunken [person] may be careful."  Bageard v. Consol. Traction Co., 64 N.J.L. 316, 322 (1900).

Accordingly, "evidence of prior drinking is admissible as being relevant to the issue of the driver's fitness only when there is some supplementary evidence from which the trier of the fact may reasonably conclude that the drinking affected the safe operation of the vehicle."  Gustavson, 206 N.J. Super. at 544-45.  Adequate supplementary evidence includes, but is not limited to, "conduct such as excessive drinking, driving at an excessive speed, recklessness or erratic driving, drunken behavior at the accident scene, or similar acts suggestive of an unfitness to drive."  Id. at 545 (citing Rovegno v. Geppert Bros., Inc., 677 F.2d 327, 330-31 (3d Cir. 1982)).

Under Gustavson, evidence of alcohol consumption is not per se inadmissible.  While there is "no rigid standard" for determining what qualifies as necessary supplementary evidence for the admission of a driver's consumption of alcohol, "the controlling consideration is whether 'the evidence . . . present[s] a picture of unfitness to drive sufficiently clear that the probative value of the evidence of drinking or intoxication outweighs its potential for unfair prejudice.'"  Id. at 546 (quoting Rovegno, 677 F.2d at 331).

A-3405-22

The Pennsylvania Supreme Court addressed its own supplementary evidence rule related to the admission of alcohol consumption. In Coughlin v. Massaquoi, 170 A.3d 399, 409 (Pa. 2017),[3] that court held:

> [T]here will not always be witnesses to a car accident or to the parties' behavior or demeanor leading up to that accident. . . . If [courts] categorically exclude relevant BAC evidence from all cases which lack independent corroborating evidence of . . . intoxication, [courts] would be depriving juries of valuable insight, which, absurdly, would place [the intoxicated party]—whose intoxication potentially contributed to the accident for which they are suing—at an unfair advantage simply because no one happened to witness the [intoxicated party's] behavior prior to the accident or the accident itself.

Here, defendants proffered evidence of decedent's BAC and Dr. Brick's testimony that a .054 BAC level impaired decedent's ability to drive safely. In this case, decedent's BAC level is highly probative based on the limited facts regarding the happening of the accident. No one witnessed the accident. Nor did anyone testify about decedent's behavior or activities prior to the accident. Additionally, plaintiff did not proffer testimony from an accident reconstruction expert to offer an opinion as to how the accident happened.

---

[3] We note "[p]ublished out-of-state judicial decisions, although persuasive rather than binding, carry great weight . . . ." State v. Pickett, 466 N.J. Super. 270, 316 (App. Div. 2021).

A-3405-22

Defendants offered Dr. Brick's testimony to explain why decedent's car struck defendants' truck. The judge instructed the jury regarding consideration of expert testimony, including the experts' reasons for testifying, the experts' qualifications, and whether the facts relied upon by the experts actually exist. Moreover, in the jury charge, the judge explained the jury was not bound by the testimony of an expert, and may "accept or reject all or part of any expert's opinion." Model Jury Charges, (Civil) "Expert Testimony" 1.13 (approved Apr. 1995).

If the jury believed Dr. Brick's testimony, his testimony offered an explanation how, on a clear night, decedent's car, travelling on a straight road, crossed over the fog line, and collided with a truck indicated by amber strobe lights and reflective triangles. The defense expert testified the tractor trailer was illuminated, and the investigating police officer noted decedent appeared to have taken no corrective action, such as braking or turning, to avoid the collision. Based on these facts, Dr. Brick opined decedent was unfit to drive based on her BAC.

"All damaging evidence is prejudicial; it is only when the probative value is substantially outweighed by the potential prejudice that the evidence should be excluded." State v. Scherzer, 301 N.J. Super. 363, 469 (App. Div. 1997).

19

Gustavson clarified that evidence of alcohol consumption must present a "sufficiently clear" picture of a party's unfitness to drive such that "the probative value of the evidence of drinking or intoxication outweighs its potential for unfair prejudice." 206 N.J. Super. at 546 (quoting Rovegno, 677 F.2d at 331).

Having reviewed the record, we are satisfied the judge did not abuse his discretion in determining the probative value of plaintiff's BAC outweighed its potential for unfair prejudice. Given the nature of the accident, the dearth of other evidence as to the cause of the accident, and the defense expert's opinion decedent's BAC level rendered her unfit to drive, the judge did not err in admitting plaintiff's alcohol consumption as evidence.

II.

We next consider plaintiff's argument the judge erred in denying his motion to exclude Dr. Brick's testimony as improper net opinion. Plaintiff argues Dr. Brick's expert testimony "should have been precluded under [N.J.R.E.] 702 and 703," because it was "based on his assumption that [decedent] was impaired."

"N.J.R.E. 703 addresses the foundation for expert testimony." Townsend v. Pierre, 221 N.J. 36, 53 (2015). An expert's testimony must be grounded in "facts or data derived from (1) the expert's personal observations, or (2) evidence

admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence[,] but which is the type of data normally relied upon by experts in forming opinions on the same subject." State v. Townsend, 186 N.J. 473, 494 (2006) (quoting Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. to N.J.R.E. 703 (2005)).

"The corollary of that rule is the net opinion rule, which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." Ibid. An expert must "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011)). An expert's conclusion will be "excluded if it is based merely on unfounded speculation and unquantified possibilities." Vuocolo v. Diamond Shamrock Chems. Co., 240 N.J. Super. 289, 300 (App. Div. 1990). There must be some "authority supporting [the] opinion," which can take the form of "any document, any written or unwritten custom, or established practice that the [industry] recognized as a duty it owes." Satec, Inc. v. Hanover Ins. Grp., Inc., 450 N.J. Super. 319, 333 (App. Div. 2017).

21

In this case, Dr. Brick explained a person driving with a .054 BAC, based upon literature regarding the effect of alcohol, including "laboratory studies," "driver simulator tests," and "highway epidemiology, or studies on failed crashes," would be impaired. Relying on formulas in a published report for the National Institute on Alcohol Abuse and Alcoholism analyzing "the blood alcohol concentration, the gender of the subject, and the age of the subject . . . in . . . these types of highway fatalities," Dr. Brick opined it was more than four times as likely for a driver with a .054 BAC to experience a fatal collision compared to a sober driver. Based on the foregoing, Dr. Brick concluded decedent's .054 BAC impaired her ability to drive.

We are satisfied Dr. Brick's testimony did not constitute impermissible net opinion. Dr. Brick did not base his opinion "on unfounded speculation and unquantified possibilities." See Townsend, 221 N.J. at 55 (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)). Importantly, Dr. Brick "identif[ied] the factual bases for [his] conclusions, explain[ed] [his] methodology, and demonstrate[d] that both the factual bases and the methodology [were] reliable." Ibid. (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). Thus, the judge did not err in admitting Dr. Brick's testimony.

We also reject plaintiff's argument objecting to Dr. Brick's testimony that decedent's drinking was "a significant contributing factor" to the accident. Plaintiff asserts this testimony was inadmissible because Dr. Brick failed to "eliminate other factors as being relevant," failed to "review an accident reconstruction analysis," "any eyewitness observations or testimony," or "the deposition testimony of the investigating officers," and "did not consider commercial driver's manuals."

"An expert's proposed testimony should not be excluded merely 'because it fails to account for some particular condition or fact which the adversary considers relevant.'" Id. at 54 (quoting Creanga v. Jardal, 185 N.J. 345, 360 (2005)). "The expert's failure 'to give weight to a factor thought important by an adverse party does not reduce his testimony to an inadmissible net opinion if he otherwise offers sufficient reasons which logically support his opinion.'" Ibid. (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 402 (App. Div. 2002)). Instead, "[s]uch omissions may be 'a proper subject of exploration and cross-examination at a trial.'" Id. at 54-55 (internal quotation marks omitted) (quoting Rosenberg, 352 N.J. Super. at 402).

Here, plaintiff's counsel cross-examined Dr. Brick extensively at the de bene esse deposition. During Dr. Brick's testimony, counsel had ample

23                                                                    A-3405-22

opportunity to explore "other factors" potentially relevant to the happening of the accident. Further, the judge gave the jurors detailed instructions regarding their consideration of the experts' testimony. We presume the jury followed the judge's instructions. State v. Gonzalez, 249 N.J. 612, 635 (2022).

### III.

We turn to plaintiff's argument the judge erred in denying plaintiff's motion in limine to bar Dr. Brick's testimony regarding the increased risk of an accident based on decedent's BAC level and Dr. Brick's use of the Behavioral Effects and Relative Risk charts. Plaintiff argues Dr. Brick's opinions were "speculative and unreliable . . . because the accident data he relied upon in forming his conclusions [did] not involve substantially similar crashes" and he failed to proffer his opinions within a reasonable degree of medical probability. We reject these arguments.

Here, defendants did not offer Dr. Brick as a medical causation expert. Rather, defendants presented Dr. Brick to offer testimony limited to decedent's level of intoxication and whether her .054 BAC impaired her ability to drive. Dr. Brick's opinions on these topics were offered "within a reasonable degree of scientific probability." We discern nothing improper about the admission of Dr.

Brick's testimony within the scope of his expertise in the field of forensic pharmacology.

Nor do we discern anything speculative or improper in Dr. Brick's testimony because he failed to rely on data involving similar crashes. Dr. Brick relied on scientific literature addressing BAC levels and impairment based on those levels. Again, plaintiff had ample opportunity to cross-examine Dr. Brick regarding the bases for his opinions.

Plaintiff's reliance on <u>Wymbs ex rel. Wymbs v. Township of Wayne</u>, 163 N.J. 523 (2000), is misplaced. The holding in <u>Wymbs</u> addressed the admissibility of evidence regarding "multiple accidents at a particular location" for "injuries caused by a 'dangerous condition' on the property of a public entity" under the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to 12-3. 163 N.J. at 531, 533 (quoting N.J.S.A. 59:4-2). This is not a Tort Claims Act case. Further, the rule in <u>Wymbs</u> has no bearing on the admissibility of scientific data regarding the impact of alcohol consumption and accident risk.

IV.

We next address plaintiff's argument the judge erred in permitting Caton to testify about his daughter's autism after plaintiff's counsel objected. Plaintiff

asserts he is entitled to a new trial as the testimony was "irrelevant and prejudicial." We disagree.

The testimony about Caton's autistic daughter was fleeting. Because plaintiff called Caton as his witness, defense counsel cross-examined Caton. In asking preliminary background questions, defense counsel asked Caton about his family. Caton responded he had a wife and two adult children, a son who is a welder and a daughter who "has autism." Caton explained his daughter lived with him and his wife.

Plaintiff's counsel objected to this testimony. The judge overruled the objection, explaining: "A certain amount of leeway is permitted . . . [in] how attorneys humanize . . . their clients, their witnesses. The poison is in the dosage. It depends upon how much. And we've kind of reached the limit at this point." Caton then briefly answered two additional questions about his daughter.

N.J.R.E. 403 permits a trial court to exclude relevant evidence if its probative value is substantially outweighed by the risk of undue prejudice. "Evidence claimed to be unduly prejudicial is excluded only when its probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the issues in the case." Griffin, 225 N.J. at 421 (alteration

in original) (internal quotation marks omitted) (quoting <u>State v. Koskovich</u>, 168 N.J. 448, 486 (2001)).

Here, Caton briefly mentioned his autistic adult daughter. Caton explained his daughter relied on him and his wife as her caretakers. Having reviewed the record, we are satisfied the testimony regarding Caton's daughter was very limited. The objection by plaintiff's counsel likely drew more attention to the issue than Caton's actual testimony. Further, defense counsel omitted any reference to Caton's daughter during closing argument. On this record, we are satisfied the passing mention of Caton's autistic daughter had a de minimis impact, if any, on the jury's verdict. Thus, the judge did not abuse his discretion in denying plaintiff's application for a mistrial on that basis.

V.

We next consider plaintiff's argument the judge erred in denying his motion for a mistrial. Plaintiff moved for a mistrial based on defense counsel's cross-examination of Dr. Coyer. Plaintiff contends the questions directed to Dr. Coyer were "highly prejudicial," "resulted in a verdict of mistake, passion and prejudice," and warranted a mistrial. We disagree.

On cross-examination, defense counsel asked Dr. Coyer:

> Q:    [A]re you aware that organizations, such as the National Transportation Safety Board, NTSB, [are]

27

recommending that [the] per se [BAC] limit [for driving while intoxicated] be reduced from .08 to .05?

Plaintiff objected, and the judge sustained the objection.

Defense counsel then asked Dr. Coyer:

> Q:   Are you familiar with what's known as an ignition interlock device, sir?
>
> A:   Yes.
>
> Q:   And that's a device . . . fitted onto cars that blocks the user from being able to start the car unless they blow into a breathalyzer to test their blood alcohol level?

Plaintiff's counsel again objected, and the judge overruled the objection.

However, the judge invited plaintiff "to renew [his] objection depending upon

subsequent questions."

Defense counsel continued questioning Dr. Coyer, asking the following:

> Q:   And . . . are you familiar with how [interlock] devices work?
>
> A:   Yes, you—if you're convicted of a DUI or—at a particular level they would install that into your vehicle and for you or someone to drive it you would have to blow into it and . . . it detects alcohol.  And if alcohol is detected it will not start the vehicle.
>
> Q:   And you're aware then that[,] for interlock devices that prevent[] a driver from driving a car when their blood alcohol is above a certain level[,] that those devices are required to be calibrated to .05 percent?

28

Plaintiff again objected, and the judge sustained the objection. Plaintiff's counsel then asked for a sidebar conference.

At the sidebar conference, plaintiff's counsel requested a limiting instruction directing the jury to disregard defense counsel's questions. Counsel were unable to agree on a limiting instruction at the sidebar conference.

After a judicial recess, plaintiff's counsel moved for a mistrial, arguing:

> [A]s Your Honor is aware . . . alcohol evidence involving the operation of a motor vehicle in and by itself is unfairly prejudicial. And I understand, you know, the factors and Your Honor ruled that would come in. However, Your Honor also had an in limine ruling eliminating reference to commercial driving standards and the zero[-]tolerance standard and the like. And this is a backdoor way to violate that order. And given the prejudicial nature of the evidence we feel a motion is necessary at this time.

In denying the mistrial motion, the judge explained:

> [A]t the . . . minimum[,] the question came to the line and a bit above, [and] at a maximum[,] it blew through the line. I'm willing to give a limiting instruction to . . . the jury. The exact phraseology, if it's requested. I'll first permit . . . plaintiff to proffer a limiting instruction. I'll see what the defense response is. If they can't agree[,] then I know how I want to phrase it and that's the way I'll do it. If [] plaintiff wants a limiting instruction, . . . it's a double[-]edged sword and not everybody believes that these limiting instructions do the trick, so to speak, and may cause more attention to an issue than otherwise would be.

A-3405-22

Neither counsel proffered a proposed limiting instruction.

"The grant of a mistrial is an extraordinary remedy that should be exercised only to prevent manifest injustice." Escobar-Barrera v. Kissin, 464 N.J. Super. 224, 231-32 (App. Div. 2020) (quoting Belmont Condo. Ass'n, Inc. v. Geibel, 432 N.J. Super. 52, 97 (App. Div. 2013)). "[T]he power to grant such motion should be exercised with the greatest of caution." Id. at 231 (quoting Wright v. Bernstein, 23 N.J. 284, 296 (1957)). A mistrial shall be granted as of right only "when the error or irregularity complained of patently fails to take into account the substance of a fundamental right of a party and deprives the party of the essence of such right, in a way that is plainly ineradicable either by an instruction or other action by the court." Ibid. (quoting Wright, 23 N.J. at 296). The decision to deny a mistrial is within the sound discretion of the trial court and will not be reversed on appeal unless there is a showing of abuse of discretion. State v. Harris, 181 N.J. 391, 518 (2004).

Here, defense counsel's questions did not deprive plaintiff of a "fundamental right." Further, the judge invited plaintiff's counsel to propose an appropriate limiting instruction regarding Dr. Coyer's cross-examination. Any prejudice could likely have been cured by a limiting instruction. Because the

prejudice, if any, could have been eliminated by a proper limiting instruction, the judge did not abuse his discretion in denying plaintiff's mistrial motion.

VI.

Lastly, we consider plaintiff's argument the judge erred in denying his motion for a new trial. Plaintiff asserts the verdict "was against the weight of the evidence." We disagree.

"A motion for a new trial is addressed to the sound discretion of the trial court." Baumann v. Marinaro, 95 N.J. 380, 389 (1984). "[T]o determine whether [a litigant] is entitled to a new trial . . ., we consider whether denying a new trial would result in a miscarriage of justice shocking to the conscience of the court." Liberty Ins. Corp. v. Techdan, LLC, 253 N.J. 87, 103 (2023) (internal quotation marks omitted) (quoting Township of Manalapan v. Gentile, 242 N.J. 295, 305 (2020)).

"A new trial may be granted to all or any of the parties and as to all or part of the issues on motion made to the trial judge . . . if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." Diakamopoulos v. Monmouth Med. Ctr., 312 N.J. Super. 20, 36 (App. Div. 1998) (quoting R. 4:49-1(a)). Accordingly, "[a] trial judge may properly

31

grant a motion for a new trial [if] the verdict is against the weight of the evidence." Conrad v. Robbi, 341 N.J. Super. 424, 443 (App. Div. 2001) (citing Dolson v. Anastasia, 55 N.J. 2, 6 (1969)).

"The object of the trial judge's review, however, 'is to correct clear error or mistake by the jury.'" Ibid. (quoting Dolson, 55 N.J. at 6).  In doing so, the judge "must study the record carefully to determine whether reasonable minds might accept the evidence as a basis to support the jury verdict," and "may not substitute his judgment for that of the jury merely because he would have reached an opposite conclusion." Ibid. (quoting Dolson, 55 N.J. at 6).  On appeal, "[i]f the court decides that reasonable minds may conclude that adequate evidence was presented to support the verdict, it should be affirmed." Id. at 444.

Here, there was adequate evidence supporting the jury's verdict, and the verdict did not shock the judicial conscience.  The undisputed evidence demonstrated decedent, who had a .054 BAC, crossed a white reflective fog line, entered the highway shoulder, and collided with a parked truck marked by reflective triangles and flashing amber strobe lights.  Additionally, there was no evidence indicating the accident resulted from bad weather, an obstacle in the road, or mechanical failure of decedent's car.  Further, during his testimony, which the jury was free to accept or reject, Dr. Brick opined decedent's .054

32

BAC impaired her ability to drive safely. There was adequate admissible evidence in the record supporting the jury's verdict. Therefore, the judge did not abuse his discretion in denying the new trial motion.

To the extent we have not addressed any arguments raised by plaintiff, they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3405-22